Chaddie J. SALISBURY, Plaintiff,

v.

HOUSING AUTHORITY OF the CITY OF NEWPORT, Marguerite Robinson, Irene Deaton, Ann Frederick, Bill G. Wilder, Betty K. Gillespie, and Day Johnston, Defendants.

Civ. A. No. 83–30.

United States District Court,
E.D. Kentucky,
Covington Division.

Aug. 20, 1985.

Richard A. Getty, John S. Rees, and Janet P. Jakubowicz, Greenebaum, Doll & McDonald, Louisville, Ky., for Chaddie Salisbury plaintiff.

Richard G. Meyer, Deters, Benzinger & Lavelle, Covington, Ky., for Housing Authority of the City of Newport defendant and Marguerite Robinson defendant.

Robert W. Carran, Covington, Ky., for Irene Deaton defendant and Ann Frederick defendant.

Robert G. Breetz, Stites & Harbison, Louisville, Ky., for Bill G. Wilder defendant.

Charles M. Perkins, Georgetown, Ky., for Betty K. Gillespie defendant.

Willie Mathis, Jr., Florence, Ky., for Day Johnston defendant.

## OPINION AND ORDER

BERTELSMAN, District Judge.

This is a 42 U.S.C. § 1983 civil rights action in which plaintiff charges that she was deprived of her rights to substantive and procedural due process secured by the Fourteenth Amendment to the Constitution of the United States. She also asserts deprivation of her right to free speech as guaranteed by the First Amendment as well as state law claims of breach of contract, defamation, and interference with contractual relations.

### Facts

On April 29, 1982, plaintiff entered into a three year employment contract with the Newport Housing Authority (NHA)[1] to serve as its executive director. Paragraph 8 of that contract requires notification ninety days prior to termination by either party and provides that she may be terminated only for "just cause and said cause must be factual, valid and documented." On May 20, 1983, Salisbury was terminated by the NHA.

Salisbury contends that her termination was not for just cause, but was motivated by fear on the part of some members of the NHA that she would "blow the whistle" on improper activities in which they were involved, and because of her public criticism of the NHA and its members. This is the basis of her First Amendment claim.

Salisbury's termination followed several months of intense, well publicized volleys of charges and countercharges between her and members of the NHA, as well as disagreements among the Authority members sufficient to induce two of them and counsel for the NHA to resign. The attorney was replaced by the defendant Wilder, personal attorney for Irene Deaton, Mayor of Newport and plaintiff's principal antagonist.

At one point in the ongoing dispute the Board informed Salisbury that it was about to fire her without further ado. She then filed this civil rights action in this court and sought a temporary restraining order (T.R.O.), which motion came on for hearing a few hours before the meeting at which Salisbury was to be terminated. At the conclusion of that hearing, this court declined to enter the T.R.O. on the ground that it was premature, since the Authority had not yet acted. However, the court from the bench formally advised those defendants that were present that Salisbury did have a contractual property right and that they could be personally liable in damages if they terminated her in violation of her due process and other constitutional rights.

The Authority did not terminate her immediately but suspended her with pay, brought the formal charges, and held the hearing with which we are now concerned. The hearing was held over Salisbury's frequent protests that the members of the Authority were not impartial. There are

---

1. The function of the Housing Authority is to establish and operate low cost housing projects within the City of Newport. Kentucky Revised Statute 80.020. It is managed by a board consisting of the mayor of the city *ex officio* and four other members the mayor appoints. KRS 80.030. Defendants argue that its actions are not actions of a public agency and, therefore, the requisite "state action" element for a claim under § 1983 is lacking. A cursory review of KRS Chapter 80 indicates, however, that the NHA is a state agency whose actions are state actions. *Tedder v. Housing Authority of Paducah,* 574 F.Supp. 240 (W.D.Ky.1983). Therefore, the type of analysis used by this court in *Watkins v. Reed,* 557 F.Supp. 278 (E.D.Ky.1983), *aff'd* 734 F.2d 17 (6th Cir.1984) ("close nexus" analysis between private entity and government) is not required.

no statutory procedures for hearing charges against an employee of the Authority, so the Authority heard the charges itself. At the conclusion of the hearing, which lasted several weeks, Salisbury was discharged.

Further detailed facts are set forth in the margin.[2]

2. The defendants in this action are:

Defendant, *Newport Housing Authority* (NHA), a corporate housing authority subsidized by the federal government and created pursuant to Kentucky Housing Authority law, KRS Chapter 80.

Defendant, *Irene Deaton,* the Mayor of Newport at all times relevant to this action and a member of the NHA Commission.

Defendant, *Ann Fredericks,* NHA Commission member.

Defendant, *Marguerite Robinson,* NHA Commission member.

Chaddie Salisbury is suing Deaton, Fredericks, and Robinson, both individually and in their official capacities as NHA Commission members.

Defendant, *Bill Wilder,* Deaton's personal attorney and as of February, 1983, special counsel for the NHA, hired to handle all further legal matters involving Salisbury.

Defendant, *Betty Gillespie,* Executive Director of the Housing Authority of the City of Georgetown, interim executive director of the NHA prior to Salisbury's employment, as well as March through May, 1983.

Defendant, *Day Johnston,* architect for the NHA; hired in 1980 by Gillespie as the modernization contract architect for the NHA.

A chronological listing of the events leading up to the plaintiff's termination will help the reader obtain a feel for the acerbity of the controversy between Salisbury and the defendants:

*December, 1982* —According to Salisbury, she commenced an investigation of certain work done by the general contractor on an NHA modernization project and on the design work done by defendant Johnston, the NHA architect. She allegedly did so based on information she had received of design defects. Purportedly, an independent engineering firm notified Salisbury at her request for investigation, that the work failed to meet building code requirements and that the architectural design was inadequate and improper.

*January 14, 1983* —Salisbury claims to have met with Leroy Hoffman, then chairman of the NHA Commission, in order to discuss Johnston's role regarding design defects in the modernization project and his attempted coverup thereof. This was prompted by a letter received by the plaintiff from Johnston, dated January 13, 1983. In the letter, Johnston admitted having improperly designed part of a heating duct system for the modernization project and trying to cover this up. Defendants contend that Salisbury learned of design defects and the cover-up earlier than December, 1982, and failed to disclose it to them at that time.

*January 19, 1983* —Irene Deaton claims that she was first notified by Ms. Salisbury of irregularities in the performance of a contract which NHA had entered into with the Kamex Construction Company. Deaton claims that she began a background inquiry into Ms. Salisbury's direction of the NHA, during which time she found additional evidence of mismanagement. This improper conduct allegedly involved the unauthorized issue of substantial change orders and the unauthorized hiring of a consultant who, because of his concurrent employment with Kamex, had a conflict of interest.

*January 21, 1983*— An executive session of the NHA was held. Salisbury claims that it was convened at her request to discuss matters relating to the improper work done on the modernization project. Defendants claim it was to discuss the charges developed by Ms. Deaton in her investigation of Salisbury. It is undisputed that Mayor Deaton moved for termination of Ms. Salisbury at that meeting, but the full board concluded that further investigation was appropriate prior to her termination.

*January 27, 1983*— The NHA met in an open meeting. Plaintiff claims that Deaton again moved to terminate her, but the move was defeated allegedly because Chairman Hoffman refused to vote. Plaintiff claims that Hoffman's refusal was based on his statement that the board did not have enough information to move against Salisbury at that time. She also claims that the motion by Deaton was made despite the NHA's attorney's advice that she should be afforded her due process rights prior to dismissal. Plaintiff claims that she asked for an opportunity to be heard on the charges against her both at the January 21st and January 27th meetings, but was refused.

*February 23, 1983*— Plaintiff filed this action initially to prevent the NHA from firing her without due process of law.

*February 24, 1983*— A hearing was held on plaintiff's motion for a restraining order. The motion was denied, but this court admonished the members of the NHA that failure to provide plaintiff with due process could subject them to liability.

*February 24, 1983* —Plaintiff received a letter signed by Deaton, Fredericks and Robinson listing 22 charges against her and stating that "you may be assured that the board will take action to either suspend or terminate your contract based upon the above charges at a future date." The letter also stated that her contract with the board was invalid, charging that she drew it up and presented it to the board, but it was never approved by the HUD office.

*March 1, 1983* —Plaintiff mailed a letter to the NHA requesting an impartial hearing examiner to hear the charges against her. She claims that the Authority refused to grant the requested hearing and that she was told that the proper body to hear her case was the NHA itself. She claims that the NHA at that time consisted of Deaton and Fredericks, due to the resignation of

In its present posture, the case presents the court primarily with an issue on which there are relatively few judicial opinions—what are the characteristics of an impartial fact-finding tribunal, and when is one required, when the other elements of due process are present?

### Plaintiff's Right to Due Process

It is uncontested that plaintiff had a property right, created by state law by reason of her contract, which right was protected by the due process clause. *Roth v. Board of Regents*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Kendall v. Board of Education of Memphis City*, 627 F.2d 1 (6th Cir.1980) (teacher terminated during one year contract).

 As a public employee with "tenure" for a limited term, there is no doubt that due process entitled her to a pretermination hearing on whether "just cause" existed for her dismissal. *Cleveland Board of Ed-ucation v. Loudermill*, —— U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (extensive discussion).

 The Board chose to give Salisbury a full-blown pretermination hearing rather than an abbreviated pretermination hearing and a trial-type post-termination hearing, as it might have done.[3] The extensive hearing granted to plaintiff was the only hearing she received. Since she was suspended with pay at the time it was held it was a pretermination hearing. Nevertheless, because it was the only hearing, due process required that it be the "trial-type" hearing usually held as a post-termination hearing.

The hearing contained all of the outward indicia of due process. Plaintiff was permitted to be represented by counsel, who cross-examined witnesses and called witnesses on plaintiff's behalf. The hearing was formal in nature and both a stenographic and videotape record were made.

---

three other members of the Authority. She claims that Deaton and Fredericks both had either brought or seconded all of the charges against her.

*March 2, 1983—* The NHA suspended Ms. Salisbury, according to them with full pay, and scheduled a hearing for April 9, 1983. Plaintiff claims that just prior to the scheduled hearing which was continued until April 16, 1983, the NHA asserted four additional charges against her which were to be heard at the same time as the original charges, despite her repeated objections to the lack of adequate notice of the additional charges.

*April 16, 1983—* A hearing was held before the NHA. According to defendants, Ms. Salisbury appeared with counsel who called and examined witnesses on her behalf and cross-examined witnesses against her. After several weeks of hearings, the NHA issued a decision on May 20, 1983, which found that there was just cause to terminate plaintiff, effective August 18, 1983.

Plaintiff is now suing on the following grounds:

(1) That all the defendants individually and collectively conspired to deprive her of her (a) employment contract, and (b) liberty (interest in her good name and reputation) interests without due process of law. She claims procedural irregularities at the hearing itself including lack of impartial decision-makers, bias, prejudgment and multiple roles of the hearing examiners.

(2) She claims that Deaton and Wilder violated her liberty interests by providing the media with information regarding her that they knew or should have known was false and misleading.

(3) Plaintiff claims that defendants conspired unlawfully to deprive her of her property and liberty interests as punishment and in retribution for exercising her First Amendment right of free speech.

(4) She claims breach of contract by the NHA.

(5) She claims that Wilder, Gillespie and Johnston induced the NHA to breach its contract with her intentionally and maliciously, and thereby interfere with her contractual relations.

(6) Plaintiff charges that Wilder and Deaton are liable for defamation in that they published false and defamatory statements in the paper against her.

All of this was attended by widespread publicity, and the charges and countercharges between plaintiff and the board, especially Mayor Deaton, became a local *cause celebre.* These events were characterized by bitter animosity between the two sides of the dispute.

**3.** *Loudermill* held that a "tenured" public employee is entitled under due process to a pretermination hearing, before he or she can be discharged. However, this hearing may be "abbreviated," that is, consist only of notice of charges and an opportunity to respond, if followed by an adequate post-termination hearing. Because of the public charges made against her, plaintiff was also entitled to the hearing to attempt to clear her name. *Burkhart v. Randles,* 764 F.2d 1196 (6th Cir.1985) and cases therein cited.

Except for one or two additional charges of which she claims she did not have sufficient advance notice, plaintiff had proper written notice of the charges brought against her.

### Plaintiff was Denied her Right to an Impartial Decisionmaker

■ Plaintiff contends, however, that these due process indicia were illusory because she was deprived of the impartial decisionmaker she had demanded. The abstract proposition that a public employee facing a due process hearing on charges is entitled to an impartial decisionmaker has been stated many times in the decisions. *See, e.g., Hortonville Joint School District No. 1 v. Hortonville Education Assn.,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976); *Kendall v. Board of Education of Memphis City,* 627 F.2d 1, 5 (6th Cir.1980) and other cases hereinafter discussed. However, it has proved difficult to define precisely this right in practice in cases involving the varied disputes that arise in the hurly-burly of local government.

■ When an employee of local government is discharged for cause, it is quite common for the initiator of the charges to participate in the ultimate decision whether the charges are justified. The smaller the unit of local government, the more likely this is to be true. This has been recognized by the courts, and it is well established that mere familiarity with the facts of a case gained as initiator of charges does not *per se* disqualify a decisionmaker. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); *Hortonville Joint School District No. 1 v. Hortonville Education Assn.,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976).

Remarkably, although a due process right to an impartial decisionmaker is well-established, there are relatively few cases in which it has been held that due process was denied because the decisionmaker was biased.[4] That this is such a case, however, is apparent.

The leading decision on the subject is *Hortonville, supra,* which involved a school board which initiated charges of participating in an unlawful strike against the teachers under its jurisdiction. The Board granted a hearing but acted as the decisionmaker. Even though the Board had participated in the negotiations preceding the strike, the Supreme Court held that the Board was not disqualified to make the final termination decision. The Court observed that the Board members did not have "the kind of personal or financial stake in the decision that might create a conflict of interest" and that there was "nothing in the record to support charges of personal animosity." 426 U.S. at 491–92, 96 S.Ct. at 2313–2314. The Court held that the teachers had "failed to demonstrate that the decision to terminate their employment was infected by the sort of bias that we have held to disqualify other decisionmakers as a matter of due process." 426 U.S. at 496, 96 S.Ct. at 2315–2316. Also entering into the Court's decision was the consideration that, inasmuch as the teachers admitted they were on strike, "there was no possibility of an erroneous factual determination on this critical threshold issue." 426 U.S. at 494, 96 S.Ct. at 2314–2315.

■ Other decisions also make it apparent that mere involvement, or even an instrumental role, in bringing charges against a public employee does not disqualify an official or governing board from acting as the final decisionmaker.

For example, in *Brasslett v. Cota,* 761 F.2d 827 (1st Cir.1985), a town manager brought charges against the fire chief for allegedly making false charges concerning the insufficiency of fire protection. The town's due process structure for its employees provided for a hearing tribunal to render an advisory opinion to the manager who was the ultimate decisionmaker. Even though the manager had made the initial decision to terminate the chief, the appellate court affirmed the trial court in holding that due process had not been violated for lack of an impartial decisionmaker. The Court summarized its rationale as follows:

---

**4.** One such case is *Staton v. Mayes,* 552 F.2d 908 (10th Cir.1977) (school board).

"The court below was quite correct in observing that Brasslett failed to demonstrate that Cota harbored actual bias against him. In addition, he made no showing that circumstances existed which might ordinarily give rise to an inordinate risk of bias; Cota had no pecuniary interest in the outcome of the plaintiff's appeal nor did he have any animosity toward Brasslett as a result of personal criticism or attacks. To the contrary, even after the interview, Cota described his working relationship with Brasslett as a good one.... Accordingly, any argument that the Town of Orono neglected to provide Brasslett with an impartial decisionmaker must fail." (Citations omitted)

*Id.* at 837.

Another very pertinent decision is *Morris v. City of Danville,* 744 F.2d 1041 (4th Cir.1984). In *Morris,* a complaint was made to a city manager concerning the plaintiff police chief. The manager caused an investigation to be made by the Commonwealth's attorney, who made an extensive report stating that the chief had been guilty of several violations of local procedures and state law. After the chief had apparently declined a pretermination hearing, he was suspended without pay and relieved of his duties, subject to a right under local procedures to demand a hearing before the manager.

The manager held a six-day hearing and made the final decision to dismiss the chief. In his subsequent action in the federal district court the primary complaint of the chief was that he had been denied an impartial decisionmaker. The district court agreed, holding that the participation of the city manager disqualified him from acting as an impartial decisionmaker, thus denying the chief due process. In a carefully reasoned decision, discussing many authorities, the Circuit Court of Appeals reversed on appeal. The appellate court held that the participation of the manager in bringing the charges did not disqualify him under the rule of *Withrow* and *Hortonville, supra,* but that if, upon further inquiry, which it ordered the district court to pur-

sue on remand, the manager was ultimately shown "to have had a *disqualifying personal bias* that did stem from a source other than his prior participation in the administrative process," he must then be disqualified. 744 F.2d at 1046 (emphasis added).

In holding that the role of the manager in bringing the charges did not disqualify him as the ultimate decisionmaker, the court stated:

"In this case, ... the decision by Church to terminate Morris was largely a procedural step, designed to inform Morris of the charges against him and of his opportunity to respond to them at a subsequent hearing. Similarly, Church's conditional decision was based on the *ex parte* submission of Fuller, which was embodied in the investigative report. *Cf. FTC v. Cement Institute,* 333 U.S. 683, 701, 68 S.Ct. 793, 803, 92 L.Ed. 1010 (1948) ("the fact that the Commission had entertained such views as the result of its prior *ex parte* investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject.") Contrary to the district court's view, Church's initial decision to discharge Morris operated merely to inform Morris of the charges against him and simply reflected the fact that, in Church's view, the allegations made in Fuller's report were sufficient cause to terminate Morris's employment if he did not refute them at the hearing."

*Id.* at 1045. In reversing the district court's decision that due process had been lacking, the appellate court put great weight on its view that the manager's "initial decision to terminate [the chief] was tantamount to a 'show cause' order, which notified [the chief] both of the extensive factual issues to be resolved at the hearing and of their seriousness." 744 F.2d at 1046, n. 7.

█ On the other side of the line is *Staton v. Mayes,* 552 F.2d 908 (10th Cir. 1972), where, in circumstances quite similar to those existing here, a school board was held to be disqualified by bias in deciding charges of incompetence against a superintendent, where several of the board mem-

bers had made public statements impugning the competence of the superintendent. This court concludes that in Salisbury's case such disqualification was required and that plaintiff was deprived of her right under due process of law to an impartial decisionmaker.

A synthesis of the above decisions reveals that whether or not the decision-making board or individual possesses a *disqualifying personal bias* [5] depends on the following considerations:

1. Whether the decisionmaker's role in initiating the charges was largely a procedural step, or implies that the decisionmaker's mind is closed on the issue of guilt.

2. Whether there are important issues of fact such that the decisionmaker's possible lack of impartiality gives rise to serious risk of an erroneous decision based on tainted findings of fact.

3. Whether the decisionmaker has a personal interest, either pecuniary or relating to personal prestige, in seeing that the termination is upheld.

4. Whether personal animosity exists between the employee and the decisionmaker.

Here, the Authority members' involvement was much greater than merely procedural.

And unlike the proceedings before the school board in *Hortonville*, there existed a great possibility of erroneous factual determination on the critical issues, because of the personal involvement of the NHA in the dispute with Salisbury. If Salisbury were found not guilty of the charges, then almost inevitably certain members of the NHA would be guilty of misconduct on their own part.

Here, a federal suit was already pending, such that the Authority members might be found liable for violating Salisbury's First Amendment rights, if she had been wrongfully suspended. Also, they might be found liable in a defamation action for the public allegations of misconduct they had made against her. Their prestige was also in jeopardy if Salisbury was vindicated. They obviously possessed the most intense pecuniary and personal bias.

It must also be recalled that the NHA had previously expressed an intention to terminate Salisbury, and the formal charges and hearing were only implemented because of the proceedings in this court, during which the court warned the defendants personally that they could be liable for violating Salisbury's constitutional rights if due process was not observed. Particularly pertinent is the fact that intense personal animosity existed between Salisbury and Mayor Deaton, who sat on the NHA and appointed all of the other members thereof under applicable state law. Also, Mayor Deaton's personal attorney was employed to act as special counsel for the Authority in Salisbury's hearing.

Thus, this court holds that, unlike the situations in *Hortonville, Brasslett,* and *Morris, supra,* the plaintiff here did demonstrate that each [6] of the four disqualifying factors listed above existed. First, the Authority's role in initiating the charges was more than procedural. Second, the factual issues were crucial and there was a great risk of erroneous factual findings by reason of the Authority members' bias against Salisbury. Third, the Authority members had both a pecuniary and personal interest in seeing the termination upheld because of pending and possible future litigation. Fourth, a bitter personal dispute had been raging for months between Salisbury and the Authority members, displaying considerable animosity on the part of all concerned.

Therefore, plaintiff was deprived of her due process right to an impartial decisionmaker under the facts existing in this case.

### The Effect of Existing State Judicial Remedies

Defendants argue that the existence of state judicial review of the Authority's ac-

---

**5.** The term used by the Fourth Circuit in *Morris, supra,* seems apt.

**6.** The court is not holding that all of the factors must be demonstrated in every case. Rather a balancing of the factors is required.

tion in terminating Salisbury serves to provide her with due process, even if it was lacking in the hearing before the Authority. They also contend that her right to sue on a state claim for breach of contract serves the same purpose.

■■■■■■ Defendants do not deny that there is no requirement that Salisbury exhaust either state administrative or judicial remedies. It is now well established that there is no requirement that she do either. *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *Loudermill v. Cleveland Bd. of Ed.*, 721 F.2d 550 (6th Cir.1983), *aff'd.* —— U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

Rather, defendants assert that, inasmuch as *Loudermill, supra*, held that only an "abbreviated" pretermination hearing was required if there are adequate post-termination remedies, plaintiff was not entitled to an unbiased tribunal in the pretermination hearing held here, because state judicial review provided an adequate post-termination hearing. Defendants also rely heavily on *Lee v. Western Reserve Psychiatric Habilitation Center*, 747 F.2d 1062 (6th Cir.1984), in attempting to establish this proposition.

There are several fallacies to defendants' arguments. First of all, neither *Loudermill* nor *Lee, supra*, addressed the issue of an unbiased decisionmaker. In both cases, the employees did not complain of bias, but claimed that they had been deprived of due process for lack of sufficient pretermination procedures. It was unnecessary for

the Supreme Court in *Loudermill* or the Court of Appeals in *Lee* to pass on the extent to which the "abbreviated" pretermination hearing was required to be held by an impartial decisionmaker.

Nor need this court comment on whether the "abbreviation" of a *Loudermill*-type pretermination hearing implies some relaxation of the impartiality requirement. Here, the hearing was in effect both the pretermination and post-termination hearing.[7] Plaintiff's complaint is not that the procedures were insufficient in quantity, but that although the procedures were facially adequate, they were so tainted by the bias of the tribunal as to be illusory.

The complaint is justified, as has been explained above, and the deficiency in the crucial quality of impartiality is not compensated for by the state judicial review afforded. For, in Kentucky, a public employee who can be discharged only for cause is entitled to a limited *de novo* review. The Kentucky courts have held that a right of review to this extent is implied in the state constitution. The nature of this review is that the employee may appeal to the circuit court and file the transcript of the administrative hearing there. Although both sides may introduce evidence, the employee has the burden of proof and the court may reverse the agency's decision only for arbitrariness.[8] Thus, if the deck was stacked against the employee by the bias of the administrative tribunal, judicial review does not sufficiently reshuffle the cards. An adverse determination on a credibility or other factual issue by a biased administrative tribunal may well taint the judicial review.[9]

---

**7.** Where the pretermination is "abbreviated" the post-termination hearing must be trial-type. *Carter v. Western Reserve Psychiatric Habilitation Center*, 767 F.2d 270 (6th Cir.1985), or, if only a pretermination hearing is held it must be trial-type.

**8.** *City of Henderson Civil Service Commission v. Zubi*, 631 S.W.2d 632 (Ky.1982); *Brady v. Pettit*, 586 S.W.2d 29 (Ky.1979).

**9.** Defendants also argue that the existence of adequate state remedies in a breach of contract action or administrative appeal provides sufficient due process under the doctrine of *Parratt*

*v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) and *Vicory v. Walton*, 721 F.2d 1062 (6th Cir.1983). This argument is without merit. The NHA did have opportunity to anticipate and control the proceedings. Therefore, this is not a case of a random, unauthorized act where "a pre-deprivation hearing is 'impracticable' or 'impossible.'" *Stachura v. Truszkowski*, 763 F.2d 211, 215 (6th Cir.1985). *Cf. Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433–5, 102 S.Ct. 1148, 1156–57, 71 L.Ed.2d 265 (1982); *Wilson v. Beebe*, 770 F.2d 578 (6th Cir. en banc, 1985).

### Qualified Immunity

The individual defendants argue that they are entitled to qualified immunity. This contention is clearly without merit.

■■ A governmental entity is not entitled to any claim of qualified immunity but its "officials" may raise this defense. Thus, innocent officials are protected while the redress for violation of constitutional rights is guaranteed. *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

■■ The Supreme Court has relatively recently decided that the Constitution is best served by using an objective test for qualified immunity of public officials. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Davis v. Scherer,* —— U.S. ——, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Mitchell v. Forsyth,* —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). To overcome the defense of qualified immunity it must appear that the defendant officials violated clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. at 818–19, 102 S.Ct. at 2738; *Davis v. Scherer,* 104 S.Ct. at 3018. *Mitchell v. Forsyth, supra.* The due process cases cited above show that the right to an impartial decisionmaker as an element of due process was established long before the events here in issue occurred in late 1982 and early 1983. This fact was emphatically pointed out to the defendants by plaintiff's counsel throughout the proceedings. Although some cases might present a close question whether a particular official was so involved in making the initial decision to bring charges against a public employee as to be disqualified as the ultimate decisionmaker, the court does not believe this is one of them. The disqualifying personal bias of the Authority member was by any objective standard readily apparent. Therefore, the defendants are not entitled to qualified immunity.

### State Action as to Certain Defendants

■■ Johnston, Gillespie and Wilder contend that as non-members of the NHA they acted as private individuals and not under the color of state law. Plaintiff has alleged a conspiracy of all defendants, however, to deprive her of her constitutional rights. If these contentions are proved, these defendants would be acting under color of state law for purposes of this § 1983 action. *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Tower v. Glover,* —— U.S. ——, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984); *Macko v. Bryon,* 641 F.2d 447 (6th Cir.1981).

### Rule of Necessity

■■ Defendants argue that this rule permits even a biased tribunal to decide a case if no appeal procedure or alternative exists. *Cf. Staton v. Mayes,* 552 F.2d 908 (10th Cir.1977).

The rule of necessity is an ancient rule originally developed to permit judges to hear a case in which they had an interest when there was no provision for appointment of another judge. *United States v. Will,* 449 U.S. 200, 213, 101 S.Ct. 471, 479–480, 66 L.Ed.2d 392 (1980). In Kentucky, the rule has been applied to school board members where they have the sole statutory authority to hire and fire teachers. *Carter v. Craig,* 574 S.W.2d 352 (Ky.App. 1978).

In this case plaintiff is a contractual employee of the NHA. Although KRS 80.090 reposes sole authority in the "appointing officer" to remove an authority *member,* no such provision exists regarding *employees.* KRS 80.070 grants a housing authority the power to hire any employees it deems necessary. It does not vest sole termination power in the authority.

As a result, KRS § 80.070 would permit the NHA to appoint an independent hearing examiner to hear a case and would not require the application of the rule of necessity. Considering that an impartial factfinder is an essential element of due process and the overwhelming bias of the Authority in this instance, this court holds that the Authority should have appointed an impartial hearing examiner, attempted to submit the matter to arbitration, or oth-

erwise avoided acting in a quasi-judicial capacity under the circumstances.

### Remedy

For the reasons stated above, defendants' motion for summary judgment must be denied, and plaintiff's motion for partial summary judgment to the extent based on the denial of due process must be granted.

But this does not mean that we proceed immediately to affix damages. Judge Jones in his opinion for the Sixth Circuit in *Kendall v. Board of Education of Memphis City*, 627 F.2d 1, 6 n. 6 (6th Cir.1980) has spelled out for us the procedure that must now be followed.

> "Once the plaintiff has established a deprivation of constitutional rights, the burden of proof shifts to the defendant to demonstrate that the deprivation of constitutional rights did not cause the plaintiff's injury. *Mt. Healthy Bd. of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Thus, after Kendall proved a violation of procedural due process, the Board bore the burden of demonstrating that her dismissal was not caused by its failure to afford her a proper hearing before the dismissal. To meet its burden, the Board must show that it had just cause for the dismissal, that is, that its charges against Kendall are true. *See Codd v. Velger*, 429 U.S. 624, 630, 635, 97 S.Ct. 882, 885, 888, 51 L.Ed.2d 92 (1977) (per curiam) (Brennan, J., and Stevens, J., dissenting)."

We have an unusual situation here in that neither party has demanded a jury, and we have a full transcript and videotape of the lengthy hearing before the Housing Authority. The plaintiff admits she was permitted to present all or nearly all of the evidence she desired at this hearing, although she has established that the evaluation of this evidence was tainted by bias. Therefore, the court believes that the matter is best referred to a United States Magistrate to act as Special Master, pursuant to F.R.Civ.P. 53,[10] in determining whether the plaintiff is entitled to recover damages, and to file a report and recommendation on all remaining issues, including damages. The Magistrate will review the transcript and videotape, but may take additional evidence in his discretion. His principal inquiry will be whether the charges against the plaintiff were justified, such that she would have been terminated if the hearing had been held before an impartial decisionmaker. He will also make findings on the issue whether the termination was caused by plaintiff's exercise of her First Amendment rights. *See Mt. Healthy Bd. of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

---

**10.** These facts provide the "exceptional circumstance" required by F.R.Civ.P. 53(b).