ENRIQUE HENRÍQUEZ SOTO, demandante y peticionario, *v.* CONSEJO DE EDUCACIÓN SUPERIOR DE PUERTO RICO, demandado y recurrido.

*Número:* CE-85-667 *Resuelto:* 22 de diciembre de 1987

*Jaime Rivera Torres*, abogado del peticionario; *Donato Rivera De Jesús*, abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

El presente recurso cuestiona la práctica de que los abogados del Consejo de Educación Superior (C.E.S.) actúen como oficiales examinadores en los procedimientos ante dicho organismo. Esta circunstancia impide, según el recurrente, —profesor al que fue negada la permanencia en trámite apelativo ante el C.E.S.— una adjudicación verdaderamente imparcial. El tribunal de instancia se negó a expedir el auto de revisión. Confirmamos su dictamen.

I

Los hechos pertinentes a la controversia que hoy revisamos se pueden resumir de la forma siguiente:

El profesor Enrique Henríquez Soto, licenciado en farmacia, comenzó a prestar servicios a la Universidad de Puerto Rico, Colegio Regional de Ponce, con nombramiento temporero y rango docente de instructor auxiliar durante el año académico 1972–1973. Al momento de ser nombrado existía una dificultad en el reclutamiento de profesores de química que cumplieran con todos los requisitos de preparación académica.[1] Por tal razón, se reclutó al profesor Henríquez para que enseñara esta materia, a pesar de que sólo poseía el grado de bachiller en ciencias farmacéuticas.

Su primer nombramiento probatorio le fue otorgado el 1 de septiembre de 1973 y poco tiempo después obtuvo un cambio de rango: de instructor auxiliar a instructor. Recibió a partir de entonces nombramientos probatorios sucesivos hasta completar un período de cinco años de servicio. A

[1] Surge de los autos que en años subsiguientes desapareció la dificultad en el reclutamiento o ausencia de candidatos idóneos en el área de química, de forma tal que al aproximarse la terminación del período probatorio del peticionario, la Administración de Colegios Regionales (Administración) tenía tres solicitudes de candidatos con maestría para el puesto de instructor de química.

través de todos estos años la Administración de Colegios Regionales (Administración) le advirtió al peticionario, en más de una ocasión, que no cualificaba para la permanencia por no cumplir con el requisito de la maestría.[2]

El 31 de mayo de 1978 se le comunicó al peticionario que en una reunión extraordinaria, y luego de un amplio análisis del expediente sometido, la Junta Administrativa de la Administración de Colegios Regionales (Junta Administrativa) había determinado no aprobar un cambio en su tipo de contrato a permanente. A pesar de ello, el 9 de junio de 1978 el profesor Henríquez manifestó por carta al profesor Carlos Reoyo, Rector de la Administración, su intención de continuar prestando sus servicios con un contrato probatorio y con rango de instructor. El 20 de junio de ese mismo año el Rector Reoyo contestó esta comunicación reiterando la posición de la Administración. Se le informó que no se le expediría contrato de tipo alguno para enseñar en el año académico 1978-1979.[3]

De la decisión el profesor Henríquez instó apelación ante la Junta Universitaria de la Universidad. Ésta encomendó el

---

[2] El 24 de noviembre de 1975 el profesor Henríquez solicitó licencia extraordinaria sin sueldo con ayuda económica para continuar estudios de maestría en química en el Recinto Universitario de Mayagüez. Le fue concedida el 3 de mayo de 1976, pero aproximadamente dos meses después el peticionario solicitó la cancelación y no prosiguió sus estudios.

La solicitud de cancelación de licencia fue considerada y aprobada por la Junta Administrativa de la Administración de Colegios Regionales (Junta Administrativa), no sin antes informar al profesor Henríquez que no se estaban considerando ni se considerarían propuestas de permanencia que no cumplieran con el requisito de la maestría. Se le exhortó a que continuara mejorándose profesionalmente y obtuviese su grado de maestría. No lo hizo.

[3] Sin embargo, luego de la advertencia en el sentido de que su contrato no sería renovado para el próximo año escolar, el 1 de julio de 1978 se le extendió por equivocación al profesor peticionario un sexto nombramiento con carácter probatorio que fue cancelado un mes después al percatarse la Junta Administrativa del error. Esta equivocación fue rápidamente corregida por la Universidad y, por lo tanto, no tiene el alcance alegado por el peticionario.

caso a un oficial examinador ante quien se celebró una vista evidenciaria. El examinador suscribió un informe favorable a la parte peticionaria, es decir, recomendando la permanencia.

La Junta Universitaria recibió el informe, pero al surgir varios planteamientos de derecho, y dada la circunstancia de que el oficial examinador no era abogado, dicha Junta Universitaria refirió el informe a un segundo "oficial" en ánimo de que se consideraran en toda su extensión los aspectos jurídicos del caso. Éste rindió un informe a base del récord, en el cual se negó a considerar los planteamientos de derecho del Rector porque no se habían sometido ante el primer oficial examinador y, por lo tanto, endosó sus recomendaciones. A base de estos informes, la Junta Universitaria revocó la determinación de la Junta Administrativa y ordenó la permanencia del profesor Henríquez.

De esta decisión apeló la Administración al C.E.S. Al recibir el caso, el C.E.S. lo encomendó a otro oficial examinador, el Lic. Agustín Fortuño, quien había asesorado al C.E.S. en un incidente relacionado con el perfeccionamiento de la apelación de la Administración.

La controversia que motivó la consulta giró en torno a si el término creado para apelar al C.E.S. era de carácter jurisdiccional. En modo alguno dicho asesor opinó, investigó, adjudicó, sugirió un curso a seguir, o recomendó determinada política institucional sobre la permanencia de los profesores sin maestría.

Celebrada una segunda vista evidenciaria ante el licenciado Fortuño y rendido un informe en el cual se analizaron extensamente las disposiciones legales aplicables, el C.E.S. revocó la determinación efectuada por la Junta Universitaria y, por lo tanto, denegó la concesión de la permanencia al peticionario.

En el trámite de revisión ante el Tribunal Superior el profesor Henríquez —aparte de su contención central de que es acreedor a la permanencia— cuestionó que el abogado que representaba al C.E.S. en el tribunal perteneciera al mismo bufete del oficial examinador que actuó en la vista administrativa ante el propio C.E.S.

El juez de instancia acogió el planteamiento y concedió al C.E.S. 20 días para que notificara una nueva representación legal. Superado el incidente, y luego de notificada una nueva representación, el 7 de junio de 1985 el Tribunal Superior declaró sin lugar la solicitud de revisión. En reconsideración dicho tribunal declaró nuevamente sin lugar el recurso del peticionario. Se basó en que surgía claramente del expediente que el peticionario fue advertido expresamente de que no se le concedería la permanencia si no cumplía con el requisito de grado académico que la Universidad le había exigido, condición con la que el peticionario nunca cumplió.

## II

Ante nos, los señalamientos de error son básicamente de dos naturalezas. Por un lado, el profesor Henríquez cuestiona la imparcialidad del oficial examinador que presidió la vista administrativa ante el C.E.S. Aunque no elabora el argumento, al parecer se refiere a la práctica de que el C.E.S. delegue en sus propios abogados la función de presidir las vistas administrativas en los recursos apelativos ante dicho organismo. El resto de los errores señalados giran en torno a la controversia sobre la retención de profesores sin maestría en la Universidad, cuestión de discreción y política institucional que, aunque no impide, limita notablemente nuestra intervención.

En el pasado, ante diversas situaciones, hemos expresado el principio de que el debido proceso de ley ofrece

protección contra la arbitrariedad administrativa, pero en modo alguno es "molde rígido que prive de flexibilidad" a los organismos administrativos. *Rodríguez* v. *Tribunal Superior*, 104 D.P.R. 335, 340 (1975); *López Vives* v. *Policía de P.R.*, 118 D.P.R. 219 (1987). En otras ocasiones, hemos manifestado que el debido proceso no tiene en el campo del derecho administrativo la rigidez que se le reconoce en la esfera penal. *Atiles, Admor.* v. *Comisión Industrial*, 63 D.P.R. 62, 63 (1944); *A.D.C.V.P.* v. *Tribunal Superior*, 101 D.P.R. 875, 882 (1974). Sin embargo, siempre hemos reconocido, dentro de este marco general, que el debido proceso requiere "un proceso justo y equitativo que respete la dignidad de los individuos afectados". *Rivera Santiago* v. *Srio. de Hacienda*, 119 D.P.R. 265 (1987).

De todos los valores que informan la garantía del debido proceso, el valor de la percepción de la justicia es el que con mayor claridad dicta el uso de un adjudicador imparcial con criterios independientes. Véase *Schweiker* v. *McClure*, 456 U.S. 188, 195 (1982). Redish-Marshall, *Adjudicatory Independence and The Values of Procedural Due Process*, 95 Yale L.J. 455 (1986). La necesidad de imparcialidad adjudicativa en la infraestructura del debido proceso impide al adjudicador decidir un caso si tiene interés o prejuicio real identificable o cuando las circunstancias son tales que el riesgo de parcialidad es demasiado grande. *Withrow* v. *Larkin*, 421 U.S. 35, 47 (1975).(4)

---

(4) Por lo general, se dividen las situaciones que amenazan la independencia del adjudicador en tres categorías principales. Primero, el adjudicador podría tener un interés económico en el resultado del caso. En segundo lugar, podría tener algún prejuicio personal contra una parte y, finalmente, dicho adjudicador podría estar predispuesto hacia cierta posición que una parte mantiene en el caso. Redish-Marshall, *Adjudicatory Independence*, 95 Yale L.J. 455, 457 (1986).

Se ha señalado, sin embargo, que el término "independencia" es vago y relativo. "El requisito de un adjudicador independiente al describirse en lo abstracto, parece bastante incontrovertible. Las verdaderas dificultades surgen al determinar qué grado de independencia satisface el requisito de debido proceso." Redish-Marshall, *op. cit.*, pág. 491.

■ Obviamente, la mezcla de conducta adversativa y adjudicativa presenta un delicado problema constitucional.(5) En procedimientos formales, la separación de funciones sirve para aislar al juzgador de las comunicaciones fuera del récord del personal de la agencia que interviene personalmente en los procedimientos, en menoscabo de su habilidad para impartir un asesoramiento objetivo. Este "aislamiento" también sirve para reforzar la confianza de las partes en la imparcialidad de aquel que decide y en la justicia global de los procedimientos.

---

(5) La "separación de funciones" es un principio del derecho administrativo cuyo propósito es proteger la independencia y objetividad de la función administrativa. Se pretende evitar la combinación de funciones en el procesamiento, investigación y defensa de causas. Este principio está reconocido en 5 U.S.C. sec. 554(d) de la Ley Federal de Procedimiento Administrativo, disposición que prohíbe a los fiscales o investigadores de una agencia del Gobierno de Estados Unidos participar en la decisión del caso en que han trabajado, ya sea como adjudicadores o como abogados fuera de récord. Aunque la Sec. 554(d) es aplicable sólo a ciertas adjudicaciones formales, las agencias federales observan estos principios en virtualmente todos los procedimientos donde el expediente se levanta mediante procedimientos formales de vista. Consúltense: B. Schwartz, *Administrative Law*, 2da ed., Boston, Little, Brown & Co., 1982, pág. 504; K.C. Davis, *Administrative Law Treatise*, 2da ed., San Diego, K.C. Davis Pub. Co., 1980, Vol. 3, Sec. 18.1, pág. 340 *et seq.*; Breyer-Stewart, *Administrative Law and Regulatory Policy*, 2da ed., Boston, Little, Brown & Co., 1985, pág. 680 *et seq.*; Shulman, *Separation of Functions in Formal Licensing Adjudications*, 56 Notre Dame L. Rev. 351 (1981); J.E. Maloney, *Disqualification of Administrative Law Judges in California*, 16 U.S.F. L. Rev. 229 (1982); M. Asimow, *When the Curtain Falls: Separation of Functions in the Federal Administrative Agencies*, 81 Colum. L. Rev. 759 (1981).

■ Por otra parte, la separación de funciones tiene su precio, ya que en ocasiones impide que el órgano adjudicador de la agencia pueda obtener asesoramiento del personal mejor cualificado si se estima que dicho asesor ha estado involucrado como adversario en los procedimientos. También tiene el potencial de causar serias demoras, la costosa duplicación del personal, confusión acerca de cuáles comunicaciones son permisibles e interferir con otras funciones colaterales de la agencia. B. Schwartz, *Administrative Law*, 2da ed., Boston, Little, Brown & Co., 1982, pág. 504.

En atención a estas dificultades y realidades del proceso administrativo, la jurisprudencia federal y estatal, al interpretar garantías similares, ha adoptado un enfoque claramente pragmático.

Llegado este punto, conviene aclarar ciertos extremos para precisar las bases exactas del caso ante nuestra consideración.

## III

■ En primer lugar, partimos de la premisa de que una vez la Universidad decidió brindar al peticionario la gama completa de garantías procesales en el trámite institucional de negación de permanencia, también le reconoció la oportunidad de ser oído por un adjudicador imparcial. En presencia de adecuadas salvaguardas reglamentarias que reducen las posibilidades de arbitrariedad y facilitan nuestra revisión judicial,[6] no es necesario pronunciamiento ulterior sobre si estamos ante factores que determinan un interés propietario en el empleo del profesor Henríquez. Véase *Texidor* v. *Superintendente de la Policía*, 109 D.P.R. 156, 159 (1979). Del récord se desprende que en este caso hubo amplia notifica-

---

[6] *Torres Arzola* v. *Policía de P.R.*, 117 D.P.R. 204 (1986); *García Cabán* v. *U.P.R.*, 120 D.P.R. 167 (1987).

ción, declaración de causa y vista a solicitud del maestro. No se le negó la permanencia al profesor Henríquez por una razón que pueda hacerle daño a su carácter o reputación en la comunidad, o le prive de futuras oportunidades de empleo. No estamos ante un problema de ejercicio de libertad de palabra ni tampoco el profesor ha demostrado que tenga algo más que una expectativa unilateral a la permanencia en su empleo.

En estas circunstancias, sin embargo, al exponer los valores que nutren el concepto de justicia adjudicativa, podemos válidamente referirnos a los precedentes y desarrollos correspondientes en el área del debido proceso de ley, por constituir un marco de análisis adecuado.

■ En segundo lugar, ni la Ley Universitaria ni las normas constitucionales aplicables exigen que la decisión de separar al profesor Henríquez de su empleo sea tomada o revisada por un organismo con autoridad cuasi judicial de mayor jerarquía independiente de la Universidad. *Hortonville Dist.* v. *Hortonville Ed. Assn.*, 426 U.S 482, 496–497 (1976); *Ferrario* v. *Board of Educ. of Escanaba*, 395 N.W.2d 195, 206 (Mich. 1986). Nótese, además, que el C.E.S. en el presente caso no estaba reevaluando su decisión inicial. Por el contrario, su función fue la de revisar *de novo* las determinaciones de la Junta Universitaria. Nos explicamos.

El sistema universitario está compuesto por el C.E.S., la Administración Central, la Junta Universitaria, unidades institucionales autónomas y no autónomas creadas por la ley o por disposición del C.E.S., y aquellas otras unidades y dependencias que cree el C.E.S. Reglamento General de la Universidad de Puerto Rico (Reglamento General), de 1ro de abril de 1981, Sec. 12.1. La "unidad institucional autónoma" es aquella unidad administrativa y académica dentro del sistema constituida por colegios, facultades, escuelas, servicios y otras dependencias que operan con autonomía administra-

tiva y académica. Reglamento General, *supra*, Sec. 100.43. La Administración es una unidad institucional autónoma constituida por varias unidades institucionales no autónomas, entre las que se encuentra el Colegio Regional de Ponce. En cada recinto o unidad institucional autónoma hay una Junta Administrativa que opera básicamente como cuerpo consultivo del Rector. 18 L.P.R.A. sec. 607; Reglamento General, *supra*, Sec. 24.6. El Rector de la Administración tiene los mismos deberes y obligaciones de los rectores de los recintos. Reglamento General, *supra*, Sec. 19.11. Entre estos poderes están el de nombrar y contratar al personal docente. Íd., Sec. 19.3.5. Por lo tanto, en la Administración la "autoridad nominadora" es el Rector. Sin embargo, en materia de *concesión de permanencias* la determinación está a cargo de la Junta Administrativa, a propuesta del Rector y con la aprobación del Presidente de la Universidad. 18 L.P.R.A. sec. 607(c)(4); Reglamento General, *supra*, Sec. 50.5.51.

A tenor con el esquema descrito, la decisión de no conceder la permanencia al profesor Henríquez Soto estuvo a cargo de la Junta Administrativa. Esta actuación, de naturaleza ejecutiva, sólo requirió una notificación de la acción tomada.

La decisión fue apelada ante la Junta Universitaria, órgano destinado a colaborar con el Presidente de la Universidad en su gestión de dirigir el sistema universitario y además, en lo que ahora nos atañe, a cargo de resolver las apelaciones que se interponen contra las decisiones de las Juntas Administrativas y Senados Académicos de cada recinto. 18 L.P.R.A. sec. 605(d)(5); Reglamento General, *supra*, Sec. 15.1 *et seq.* Es en este momento apelativo que por vez primera se celebra una vista ante un examinador que permite la presentación de evidencia documental y oral y rinde un informe a la Junta Universitaria que contiene sus

conclusiones de hecho y de derecho. La intervención posterior de un consultor que examinó y endosó *el récord* levantado en la vista no puede catalogarse como la de un "oficial examinador". Su función fue exclusivamente la de asesorar a la Junta Universitaria ante las dudas que ésta abrigaba en torno a las recomendaciones originales.

Por último, el Rector de la Administración decidió acudir al C.E.S. o Junta de Gobierno de la Universidad. Dicho C.E.S., además de la función incidental de entender en las apelaciones instadas contra las decisiones del Presidente de la Universidad y de la Junta Universitaria, 18 L.P.R.A. sec. 602(e)(6), constituye el organismo en el cual el Pueblo de Puerto Rico ha delegado la autoridad para dirigir, orientar, reglamentar y gobernar el sistema universitario.

En su alegato el profesor Henríquez aduce que habiéndose celebrado vista anteriormente, la revisión del C.E.S. debía limitarse a examinar el récord y determinar si en el mismo había evidencia suficiente para sostener la actuación apelada. No tiene razón. Aun si aceptamos que esta fuera la práctica usual al momento de los hechos, ello no significa que el C.E.S., actuando como cuerpo cuasi judicial, estuviese institucionalmente impedido de determinar si era o no necesario celebrar vistas administrativas adicionales. Esta materia está tratada expresamente en la actualidad en la Sec. 6.11 del Reglamento sobre Procedimientos Apelativos Administrativos de la Universidad, donde se dispone que "[l]a Autoridad apelativa determinará si es necesario celebrar vistas administrativas como parte del procedimiento para resolver las apelaciones incoadas ante ella. La celebración de una vista anterior y su grabación por medios mecánicos serán factores a tomar en consideración, pero no constituirán factores determinantes en la decisión de celebrar vistas administrativas a un nivel superior. Criterios adi-

cionales a tomar en consideración serán: (1) si el récord está incompleto o (2) si sirve a los mejores intereses de la justicia ampliar el récord del caso".

En las circunstancias presentes, el peticionario no ha podido demostrar perjuicio ante la celebración de una vista adicional en la cual pudo defenderse a plenitud. No haber prevalecido no constituye perjuicio. Por supuesto, ya desde *Rivera* v. *Benítez, Rector*, 73 D.P.R. 377, 390 (1952), resolvimos que la *revisión judicial* de las decisiones del antiguo Consejo Superior de Enseñanza sí estaban limitadas a un examen del récord administrativo.

En tercer lugar, el organismo apelativo con autoridad para adjudicar las controversias sobre la concesión o denegatoria de la permanencia del peticionario es el C.E.S. Las conclusiones y recomendaciones contenidas en el informe de un oficial examinador del C.E.S. no obligan a dicho organismo; por el contrario, el C.E.S. tiene facultad estatutaria para dictaminar sobre las cuestiones en controversia a base de su propia consideración del récord. *Hernández García* v. *J.R.T.*, 94 D.P.R. 22 (1967); *Hawkins* v. *Bd. of Pub. Ed., etc.*, 468 F. Supp. 201 (Del. 1979). En otras palabras, el *adjudicador* en el contexto de la vista apelativa, y en el significado constitucional, es el C.E.S. El oficial examinador carece de autoridad para tomar una decisión final en torno al destino del profesor Henríquez en la Universidad. *Hopkins* v. *Mayor & Council of City of Wilmington*, 600 F. Supp. 542, 551 (Del. 1984). Ello no quiere decir que las conclusiones del oficial examinador no merezcan nuestra consideración en revisión. Recuérdese que en estricto derecho dichas conclusiones forman parte del récord. Además, cuando el informe del oficial examinador que preside la vista es contrario e incompatible con el del organismo administrativo, particularmente en cuestiones que dependen del contacto inmediato con la prueba, nuestra función revisora es susceptible de tor-

narse más rigurosa. Véase *J.R.T.* v. *Escuela Coop. E.M. de Hostos*, 107 D.P.R. 151, 157 (1978).[7]

En cuarto lugar, no existe un impedimento constitucional para que el C.E.S. delegue la responsabilidad de celebrar una vista, analizar la evidencia y hacer recomendaciones. *Rivera* v. *Benítez, Rector*, supra, pág. 383 n. 3; *Hopkins* v. *Mayor & Council of City of Wilmington*, supra, pág. 552; *Board of Curators, Univ. of Mo.* v. *Horowitz*, 435 U.S. 78, 85 (1978); *Nevels* v. *Hanlon*, 656 F.2d 372, 374 (8vo Cir. 1981). El adjudicador administrativo puede tomar una decisión final a base de las determinaciones de hecho y conclusiones de derecho de un oficial delegado, unidas a las objeciones por escrito y argumentos orales del apelante. *Hopkins* v. *City of Wilmington*, 615 F. Supp. 1455, 1459 (Del. 1985). Por supuesto, aunque el C.E.S. puede delegar válidamente en sus subordinados o empleados la responsabilidad de celebrar vistas, analizar la evidencia y hacer recomendaciones, dicha delegación no lo releva de su responsabilidad de examinar la información vertida en la vista. Si la información aportada por las partes como base para la decisión nunca llegase a los ojos y oídos del adjudicador, el derecho a la vista no tendría sentido. Esto no significa que el adjudicador deba escuchar a las partes personalmente; tal requisito en el campo administrativo es impracticable. Repetimos, un administrador o junta puede retener la autoridad para tomar decisiones y válidamente delegar en subordinados la responsabilidad de celebrar vistas y hacer recomendaciones. Todo lo que se requiere es un fallo informado por parte de aquel que tiene la responsabilidad de tomar la decisión u orden final. *A.D.C.V.P.* v. *Tribunal Superior*, supra; *P.S.P.* v. *Com.*

---

[7] Para los problemas que generan los conflictos de apreciación de la prueba dentro de una misma agencia véase, en general, Davis, *op. cit.*, Sec. 17:16, pág. 327 *et seq.*

Estatal de Elecciones, 110 D.P.R. 400, 417 (1980); *Morgan* v. *United States*, 298 U.S. 468, 481 (1936); *Megill* v. *Board of Regents of the State of Florida*, 541 F.2d 1073 (5to Cir. 1976); *KFC National Management Corp.* v. *N.L.R.B.*, 497 F.2d 298 (2do Cir. 1974); *Hawkins* v. *Bd. of Pub. Ed., etc.*, supra, pág. 210.

▮ Por último, una mera alegación de parcialidad o prejuicio no es suficiente para sostener una reclamación de violación del debido proceso. La demanda debe contener alguna alegación fáctica específica que indique parcialidad o prejuicio y no descansar meramente en conclusiones. Véanse: *United States* v. *Scaccia*, 514 F. Supp. 1353, 1355 (N.Y. 1981); *N.Y. State Inspection* v. *N.Y. State Pub. Emp. Rel.*, 629 F. Supp. 33 (N.Y. 1984); *Salisbury* v. *Housing Authority of City of Newport*, 615 F. Supp. 1433, 1439–1441 (Ky. 1985); *Levitt* v. *University of Texas at El Paso*, 759 F.2d 1224 (5to Cir. 1985).

▮ Después de todo, los procedimientos y las decisiones ante un organismo administrativo tienen a su favor una presunción de regularidad y corrección que debe ser respetada mientras la parte que la impugne no produzca suficiente evidencia para derrotarla. *M.&B.S., Inc.* v. *Depto. de Agricultura*, 118 D.P.R. 319 (1987); *Murphy Bernabe* v. *Tribunal*, 103 D.P.R. 692, 699 (1975); *South P.R. Sugar Co.* v. *Junta Azucarera*, 83 D.P.R. 406, 409 (1961); *Monllor & Boscio* v. *Comisión Industrial*, 89 D.P.R. 397, 405 (1963).

▮ Para poder rebatir la presunción de que los administradores que fungen como adjudicadores carecen de parcialidad, las alegaciones deben revelar un verdadero prejuicio o un interés pecuniario o institucional que los descalifique. *Schweiker* v. *McClure*, 456 U.S. 188, 195 (1982); *Wolkenstein* v. *Reville*, 694 F.2d 35, 41 (2do Cir. 1982); *United States* v. *Morgan*, 313 U.S. 409, 421 (1941).

Una vez fijados los hechos y determinada la sustancia jurídica del caso, sólo nos resta determinar las consecuencias.

Está claro que no estamos ante una combinación de conducta adversativa, investigativa y adjudicativa. Los intereses antagónicos quedaron configurados en este caso entre la Administración y el profesor peticionario. El organismo adjudicativo por mandato legal y reglamentario fue el C.E.S. El examinador sólo tuvo una encomienda limitada: celebrar la vista, analizar la prueba y hacer unas recomendaciones. La participación previa pero definida de éste en un asunto periférico a la cuestión básica en controversia, es decir, la permanencia del peticionario, en modo alguno lo descalifica para presidir la vista. No existe nada en el expediente que indique que el abogado que presidió la vista jugara un papel en el proceso decisional. No existe ni tan siquiera una alegación fáctica específica que indique parcialidad o prejuicio descalificador ni en el oficial examinador ni, lo que es más importante y decisivo, en los adjudicadores del caso, los miembros del C.E.S.

El peticionario no cuestiona la exactitud de las determinaciones de hecho del examinador, entre otras, el incumplimiento con el requisito de la maestría.

El peligro en este género de casos está más bien en el potencial de ventaja indebida que puede tener *una parte* debido a su familiaridad con el adjudicador. Tampoco hay prueba que indique que el C.E.S. escuchó argumentos de la Administración fuera del récord.

El juez de instancia, con atinado criterio, exigió al C.E.S. cambio de representación legal una vez presentado el recurso de revisión judicial. En resumen, el peticionario no ha podido trascender la presunción de regularidad en este caso.

## IV

 Las cortes no son los organismos apropiados para administrar el sistema educativo ni para resolver los conflictos que surgen día a día en la operación de la Universidad del Estado, a menos que se infrinjan directamente valores constitucionales fundamentales o cuando las actuaciones de estos organismos sean claramente arbitrarias.

 En otras palabras, nuestra intervención debe estar limitada a evitar actuaciones arbitrarias o caprichosas o en violación a los reglamentos de la entidad, o para garantizar la protección y el respeto de los derechos consagrados en las Constituciones del Estado Libre Asociado y de Estados Unidos.

En este caso no hay base en el récord que demuestre discrimen o irracionalidad en las determinaciones tomadas por el C.E.S. o por las otras estructuras administrativas y docentes de la Universidad. Véase *Harrah Independent School Dist.* v. *Martin*, 440 U.S. 194 (1979). Un examen de las disposiciones reglamentarias aplicables demuestra que era y sigue siendo la regla general que los profesores cumplan con el requisito de maestría en la disciplina que enseñan. No se trata de un requisito arbitrario o irracional. El peticionario estuvo advertido en todo momento de que le era indispensable obtener el grado de maestría para efectos de la permanencia.

La situación del peticionario fue muy diferente a la de otros casos donde la Administración concedió permanencia a profesores que no tenían aún el grado de maestría. Ninguno de dichos casos estaba relacionado con el área de química, materia que el peticionario enseñaba, o la de farmacia, en la cual tiene su preparación. Por el contrario, el foro primario tuvo prueba de que dichas especialidades se relacionaban con las computadoras, gerencia industrial, electrónica, dieté-

tica y otras, donde a juicio de las autoridades universitarias la dificultad de reclutar y retener personal cualificado era a largo plazo.

Por último, el peticionario tuvo toda la gama completa de protecciones procesales concebibles: derecho a una adjudicación imparcial, derecho a presentar evidencia, a contrainterrogar y confrontar testigos, derecho a un expediente completo y derecho a revisión judicial.

Por los fundamentos anteriormente expuestos, *se dictará sentencia mediante la cual confirme la del Tribunal Superior, Sala de San Juan.*

El Juez Asociado Señor Negrón García disiente con opinión escrita. El Juez Asociado Señor Rebollo López no intervino. El Juez Asociado Señor Ortiz se inhibió.

—o—

Opinión disidente del Juez Asociado Señor Negrón García.

## I

"Los hombres conocen muy bien lo que es la injusticia. Saben que las rayas que separan lo justo de lo injusto no pueden confundirse, y que su diferencia es más sensible que la que hay entre el día y la noche; saben que la injusticia es lo que más separa al hombre del hombre, y lo que más separa al hombre de Dios; saben que es como esos venenos poderosos que matan aunque se administren en dosis homeopáticas." M. Iglesias Corral, *El Enigma del Derecho*, Libro Homenaje a Ramón Ma Roca Sastre, Madrid, Gráficas Cóndor, 1976, Vol. I, págs. 63, 76.

Una evaluación cuidadosa y objetiva de la prueba documental —incluso la transcripción de la vista administrativa del caso— nos impide coincidir con el criterio del Tribunal. Es injusto.

La prueba abrumadoramente revela que contra el profesor Enrique Henríquez Soto se discriminó al negársele la permanencia a la cual era acreedor. Su experiencia, dedicación y restantes cualificaciones académicas no se discuten. No hay justificación alguna para sostener ese trato diferencial.

Contrario a otros casos en que la Administración de Colegios Regionales concedió permanencia a profesores que no tenían grado de maestría, al profesor Henríquez Soto se le ha tratado y evaluado con una vara distinta. La única razón válida aducida por las autoridades universitarias es que no existía —al año académico 1978–1979— dificultad en el reclutamiento de profesores de química. No es así. Sobre este extremo la Universidad sólo produjo una certificación de la *Oficina de Personal* del Colegio Regional de Ponce, expositiva de que había archivadas tres (3) solicitudes de "empleo para el área de Química" de mayo de 1975 y febrero y agosto de 1976, cuyos solicitantes tenían maestría. Nos preguntamos, ¿qué valor pueden tener estas solicitudes tan distantes, si después de mayo de 1975, se le extendieron al profesor Henríquez Soto cuatro (4) contratos por los años académicos posteriores, incluso el cancelado unilateralmente el 1ro de agosto de 1978?

## II

Arguyendo que en situaciones como la presente la función del Consejo de Educación Superior sea de carácter cuasi judicial, es cuestionable que el proceso administrativo no haya estado viciado desde su origen. Merece nuestra aprobación la siguiente visión ético-adjudicativa del Tribunal Superior:

Surge de los documentos presentados que el abogado que representa al Consejo en este recurso pertenece al mismo bufete que suplió el Oficial Examinador que actuó en la vista

administrativa ante el propio Consejo. Más aún, nos informa el abogado de la agencia que ello "es normal". Puede que sea normal, pero ciertamente no es apropiado. El Oficial Examinador se supone que sea una figura totalmente imparcial, sin interés de clase alguna en el resultado del pleito. Si el bufete que suple dicho Oficial Examinador como cuestión "normal" luego ha de suplir también el abogado que va a defender al Consejo cuando dicha decisión sea recurrida, la situación se torna en totalmente inaceptable. En primer lugar, ello crea cuando menos potencialmente un conflicto de intereses para el abogado cuando éste actúa como Oficial Examinador, y le crea la tentación de rendir un informe que sea más fácil de defender si en su día fuese objeto de un recurso de revisión. El que en la práctica el abogado que haya actuado como examinador haya podido resistir totalmente dicha tentación es irrelevante. El sistema no debe permitir tan siquiera una situación en que esa tentación existe. En segundo lugar, queda en marcada desventaja el abogado que presenta el recurso de revisión judicial, al tener que litigar contra el compañero de bufete no s[ó]lo del Oficial Examinador que actuó en este caso, sino de los Oficiales Examinadores que podrían actuar en casos futuros. En definitiva, la situación es intolerable. Se concede al Consejo de Educación Superior plazo de 20 días para que notifique a este Tribunal una nueva representación legal, la cual no deberá haber tenido contacto de. clase algun[a] con la función de suministrar oficiales examinadores al Consejo. *Exhibit* 6, pág. 1.