Brau Ramírez, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
La peticionaria, Wal-Mart Stores, Inc. ("Wal-Mart") recurre de una sentencia emitida el 7 de febrero de 1996 por el Tribunal de Primera Instancia, Sala Superior de Aguadilla, declarando no ha lugar un recurso de Revisión Judicial instado por la peticionaria e imponiendo a ésta una condena de mil (1,000) dólares por concepto de honorarios de abogado, por temeridad. En el recurso la peticionaria solicitaba la revisión de una resolución *668 emitida el 28 de febrero de 1995 por la Secretaria de la agencia recurrida, el Departamento de Salud del Estado Libre Asociado de Puerto Rico, denegando la solicitud de Wal-Mart para que se le concediese un Certificado de Necesidad y Conveniencia ("C.N.C"), al amparo de la Ley Núm. 2 de 7 de noviembre de 1975, 24 L.P.R.A. sees. 334 y ss. (Supl. 1996), y del Reglamento Núm. 56 del Departamento de Salud, aprobado el 14 de mayo de 1986. La solicitud de la peticionaria era para la operación de una farmacia dentro de su tienda Wal-Mart en el Centro Comercial Plaza Isabela, ubicado en la carretera Núm. 2, Intersección con la carretera Núm. 494, Barrio Arenales Bajos en Isabela, Puerto Rico.
Mediante resolución del 29 de abril de 1996, concedimos término a la parte recurrida para expresar su posición en torno al recurso. Dicha parte compareció por escrito.
Modificamos el dictamen recurrido a los únicos fines de eliminar la condena de honorarios de abogado.
n
Según surge del recurso presentado ante nos, el 31 de julio de 1992 la peticionaria presentó una solicitud ante el Departamento de Salud para la expedición de un Certificado de Necesidad y Conveniencia con el fin de establecer una farmacia dentro de su tienda Wal-Mart localizada en el Centro Comercial Plaza Isabela. El Centro Comercial donde se proponía establecer esta facilidad está proyectado para ofrecer servicios a las comunidades de los municipios de Camuy, Lares, Quebradillas e Isabela.
La Cooperativa de Consumidores del Noroeste, Inc. y/o Farmacia Super Coop, Farmacia Rebeca, Farmacia Chaves, Farmacia Borinquen, Farmacia Yanira, Farmacia Haydee, Farmacia 3T, se opusieron a la propuesta. Se celebraron vistas administrativas para evaluar la solicitud los días 8 de agosto de 1994 y 17 de noviembre de 1994.
La peticionaria presentó como prueba testifical al Sr. Jorge Rodríguez, Sr. Murphy Fenell, Sr. René Pabón, al agrimensor Francisco Oliveras Estremera y, como perito económico, al Dr. Fernando Zalacaín.
El agrimensor Francisco Oliveras testificó que dentro del área de servicio de la propuesta facilidad sólo existía una farmacia, la Farmacia La Curva, la cual está localizada en la carretera Núm. 2 intersección con la carretera Núm. 112. Indicó que la Farmacia Los Angeles no está ubicada dentro del radio de la milla, ya que se encuentra alrededor de cincuenta (50) a cien (100) metros del borde. Ambas farmacias están localizadas en la carretera Núm. 2.
El perito economista presentado por la peticionaria, Dr. Fernando Zalacaín, preparó un estudio de viabilidad y conveniencia en el mes de julio de 1993. Indicó el Dr. Zalacaín que el área de servicio ampliada de la facilidad propuesta (Camuy, Lares, Quebradillas e Isabela), tenía una población de 118,200 personas para el año 1990, 126,300 para el 1995, y 132,600 para el año 2,000. Señaló que Isabela contaba con 41,400 habitantes para el 1995 y que su tasa de crecimiento fue de 4.7%, mucho menor que la tasa de Puerto Rico en general que fue de 10.18%. Añadió que, según sus cálculos, los residentes del área de servicios de la facilidad propuesta eran 8,000 personas.
El Dr. Zalacaín contabilizó, además, la población "flotante" del Centro Comercial, la cual estimó en 15,170 personas. Esta cifra la obtuvo utilizando los datos de tres (3) puntos de medición de tráfico vehicular que mantenía la Autoridad de Carreteras en la carretera Núm. 2, los cuales sumó. Dividió entonces esta suma entre dos (2) (para evitar el doble conteo, partiendo de la premisa de que cada vehículo que visitaba el Centro hacía dos viajes; uno de ida y otro de regreso), y multiplicó el resultado por 1.5, valor estimado para el promedio de personas por vehículo en Puerto Rico, según los datos de la Autoridad de Carreteras. La fórmula utilizada, por lo tanto fue la siguiente:
Población flotante = (Total vehículos/2) x 1.5
Conforme al testimonio de dicho perito, la propuesta cumplía el requisito de población del Reglamento Núm. 56 aprobado por el Secretario de Salud el 15 de agosto de 1986, que, en el caso de Isabela, era de 9,000 *669 habitantes por farmacia, al ser considerado un municipio categoría I.
Las recurridas, por su parte, presentaron como prueba testifical el testimonio de la Leda. Sonia Chaves, dueña de la Farmacia Chaves, y al perito económico, Dr. Francisco Cátala. Este último aclaró que la población realmente existente en el área de servicio de la facilidad era de sólo 5,174 habitantes. Indicó que el perito de la peticionaria había errado al incluir ciertos bloques censales completos, los que quedaban parcial o totalmente fuera del área de servicio.
El Dr. Cátala estuvo en desacuerdo con la fórmula utilizada por la peticionaria para el cómputo de la población flotante. Indicó que siendo la carretera Núm. 2 una de las principales vías de transportación en Puerto Rico, el grueso de la población que transita en la misma es aquella que va de Mayaguez, Arecibo a San Juan y que, de ese total, sólo de un 10% a 15%, podría ser considerado, bajo la rúbrica de "población flotante" para fines de determinar la población que utilizaría los servicios de la Farmacia propuesta.
En su testimonio, también señaló el Dr. Cátala que el perito de la peticionaria eiró al calcular el volumen del tráfico vehicular, ya que sumó los tres puntos de medición existentes, que sólo estaban a 1.25 km de distancia entre ellos por lo que era razonable suponer que dichos puntos contaban los mismos vehículos, en efecto, triplicando el tráfico vehicular real. El Dr. Cátala propuso que, en vez de sumar los puntos de medición, se tomara el más alto de éstos (23,520 vehículos) y, siguiendo de otro modo la fórmula propuesta por el Dr. Zalacaín, se dividiera esta cantidad entre dos (2) y se multiplicaría por 1.5 personas por vehículo.
El resultado ascendía a 17,640 personas en tránsito. Concluyó que el 10% al 15% de esa cuantía sería la verdadera población flotante, ascendente a sólo 2,646 habitantes. Opinó que la propuesta no cumplía con los criterios de población.
Observó dicho perito que en el Municipio de Isabela hay trece (13) farmacias lo que constituye alrededor de 3,000 residentes por farmacia. Cerca del 45% de la población puede considerarse médico indigente.
El Dr. Zalacaín, por la parte peticionaria, testificó que el establecimiento de la propuesta farmacia no afectaría la salud económica de las farmacias existentes. Basó su conclusión en el cálculo que realizara sobre el nivel de ventas de las farmacias para el año 1995, el cual era de tres millones seiscientos mil (3,600.000) dólares. De ese incremento, la farmacia propuesta tenía proyectado acaparar una porción de un millón (1,000.000) de dólares el primer año.
Por su parte, el Dr. Cátala cuestionó los señalamientos del Dr. Zalacaín, al indicar que la viabilidad de la farmacia propuesta se produciría a base del desplazamiento de las farmacias establecidas. Utilizando el estimado de la peticionaria señaló que, de concederse la propuesta, las farmacias en Isabela promediarían sólo novecientos veinte tres (923) recetas mensuales aproximadamente y que la relación de población por farmacia sería inferior a la proporción existente en todo Puerto Rico.
La peticionaria presentó evidencia para demostrar que se proponía establecer precios más bajos en medicamentos "over the counter" y productos de piso; aludió al concepto de comprar en una sola parada. Señaló que contaba con sistemas computarizados completos que mantenían la información completa de los pacientes; expresó que ofrecería una beca para la Escuela de Farmacia de Puerto Rico; que establecería un programa de clínicas y ofrecería sesiones de clínicas de cuidado de salud.
Se desfiló prueba, además, de que el 60% de la venta de medicamentos en Isabela se realizaba a través de planes médicos siendo estos últimos los que fijan el precio de dichos medicamentos.
Por otro lado, la dueña de la Farmacia Chaves testificó sobre el horario de servicio de su farmacia (8:00 a.m. a 9:00 p.m.). Indicó que contaba con un plan de descuento a pacientes envejecientes mayores de sesenta y cinco (65) años y con servicio de entrega a domicilio. Señaló que todas las farmacias de la comunidad existentes en Isabela mantienen un horario de 7:30 a.m. a 10:00 p.m., abriendo una de las farmacias 24 horas en casos de emergencia.
*670 El 27 de febrero de 1995, el Oficial Examinador que presidió las vistas emitió su Informe en el cual recomendó la denegación del Certificado. En el referido Informe se adoptaron como determinaciones de hecho lo testificado por el perito económico de la parte apelada, Dr. Cátala, en lo referente a la población real y flotante que se serviría de la propuesta farmacia. El Oficial Examinador otorgó entera credibilidad a este perito y determinó que la población de Isabela ascendía a 5,174 habitantes, y la población flotante a 2,646, totalizando 7,820 como población potencial.
Esto significaba que la propuesta no cumplía con el criterio de población del Reglamento Núm. 56, ya que la suma de la población flotante y la población residente no sobrepasaba los 9,000 residentes requeridos para un municipio categoría I. Por otro lado, el Oficial Examinador concluyó que la propuesta tampoco cumplía con el requisito específico impuesto por el Reglamento de que existiera una farmacia por cada 4,000 habitantes no indigentes, ya que, dado el número de farmacias en el Municipio de Isabela, sólo existían 1,751 habitantes no indigentes por cada farmacia.
Concluyó que "en el Municipio de Isabela los servicios farmacéuticos están bien servidos, que la implantación de una nueva facilidad trastocaría la operación ordenada de estos servicios en detrimento del usurario y causaría un descalabro económico en la operación de las facilidades existentes."
El informe del Oficial Examinador fue referido a la Secretaria de Salud, y adoptado por esta última mediante Resolución del 28 de febrero de 1995.
La peticionaria presentó una Moción de Reconsideración el 10 de marzo de 1995, la cual fue acogida por el Departamento de Salud. El 11 de mayo de 1995, el Departamento emitió una Resolución denegando la reconsideración.
El 26 de mayo de 1995, la peticionaria presentó una Petición de Revisión Judicial ante el Tribunal de Primera Instancia, Sala de Aguadilla.
El 7 de febrero de 1996, mediante la sentencia recurrida, el Tribunal de Primera Instancia declaró no ha lugar la expedición del auto de revisión. El Tribunal concluyó que la petición presentada ante dicho foro no cumplía con las disposiciones de la Regla 5 de las Reglas para la Revisión de Decisiones Administrativas ante el Tribunal Superior, 4 L.P.R.A. Ap. VIII-B, lo que justificaba la denegación del recurso. Añadió que, examinada la petición en sus méritos, no existía fundamento para alterar la decisión administrativa, la cual le merecía deferencia.
La peticionaria presentó una Moción de Reconsideración el 12 de marzo de 1996, la cual no fue acogida por el Tribunal. Insatisfecha con la determinación del Tribunal de Primera Instancia, acudió entonces a este Tribunal mediante el presente recurso de certiorari.
m
En su escrito, la peticionaria plantea la comisión de varios errores por parte del Tribunal de Primera Instancia, a saber: que el Tribunal erró al desestimar la petición de revisión porque ésta no cumplía con las disposiciones de la Regla 5 de las Reglas para la Revisión de Decisiones Administrativas; al no concluir que las determinaciones de la agencia administrativa estaban sostenidas por la prueba; y al imponerle mil (1,000) dólares en concepto de honorarios de abogado, por temeridad.
La Regla 5 de las de Revisión de Decisiones Administrativas ante el Tribunal Superior, 4 L.P.R.A. Ap. VIII-s, R. 5, establece los requisitos de forma que debe cumplir todo recurso de este tipo que se presente ante el Tribunal de Primera Instancia. Dicho precepto dispone, en su inciso "i", que:

"[s]i se presenta una solicitud que sustancialmente no se ajuste a los requisitos de esta regla, el tribunal podrá desestimar el recurso. Si la omisión no fuere sustancial, el tribunal ordenará que sea subsanada y podrá paralizar el trámite hasta que ello se realice."

4 L.P.R.A. Ap. VIII-B, R. 5(i).
*671 El Tribunal de Primera Instancia determinó que el recurso de la parte peticionaria no cumplía con los requisitos establecidos por la Regla. La peticionaria admite que sus omisiones pueden haber consistido en la falta de la carátula de la petición, el índice del apéndice y la numeración de las páginas del apéndice. Coincidimos con dicha parte que estas omisiones no parecen sustanciales ni insubsanables y que, de por sí, no hubieran justificado la denegatoria del recurso.
No obstante, el Tribunal de Primera Instancia concluyó que resultaba improcedente. La peticionaria alega, en este sentido, que el Tribunal erró al concluir que la decisión de la agencia estaba sostenida por la prueba presentada.
IV
Según se desprende de la citada Ley Núm. 2 de 7 de noviembre de 1975, el C.N.C. es un documento que certifica que la facilidad o actividad propuesta es necesaria para la población que va a servir y que no afectará indebidamente los servicios existentes, contribuyendo así al desarrollo ordenado y adecuado de los servicios de salud en Puerto Rico. 24 L.P.R A. see. 334. (Supl. 1996). Al otorgar o denegar un C.N.C., el Secretario de Salud no sólo concede o deniega un permiso para operar una facilidad de salud, sino que planifica el desarrollo de éstas en las distintas áreas regionales de salud. En este sentido, su dictamen afecta no sólo al peticionario, sino al área de salud de que se trate y tiene efectos generales y regionales. Ruiz Hernández v. Mahíques, 120 D.P.R. 80, 88 (1987).
El Art. V del Reglamento Núm. 56 establece las guías generales sobre evaluación de solicitudes de este tipo. Entre numerosos otros criterios, ha de considerarse "[l]a necesidad que tiene el porciento de la población a ser servida de los servicios propuestos...".
Por su parte, el Art. VI indica los criterios específicos a ser considerados en el caso particular de cada facilidad de salud propuesta. Dispone, en lo pertinente:
"Cuando una solicitud compare favorablemente con todos los criterios aplicables, previa la celebración de vista y no haber oposición fundamentada, la solicitud deberá ser aprobada y se otorgará el certificado solicitado. Cuando la misma no llene uno o más de los criterios aplicables, la solicitud podría ser denegada. El proponente deberá presentar la información requerida en su solicitud y suministrar evidencia para probar que se cumple con cada criterio aplicable a su caso. La responsabilidad mayor de producir información necesaria recae en el proponente."
En el caso de las farmacias el mencionado Artículo VI dispone, en su inciso 13, que:

"1) Se establece una norma de una farmacia por cada 4,000 habitantes no indigentes para todos los municipios, excepto San Juan, para el cual la norma será de 3,000 habitantes no indigentes.

La relación de población por farmacia se determinará [por] la categoría a la cual pertenezca el municipio.

Categoría 1-9,000 habitantes por farmacia

Categoría 11-8,000 habitantes por farmacia

Categoría 111-6,500 habitantes por farmacia

San Juan-4,000 habitantes por farmacia

2) La ubicación se evaluará a base de la necesidad del área de servicios, la cual se compondrá del área localizada dentro del radio de una (1) milla de la farmacia propuesta. Se considerará saturada un área de servicios si se sobrepasa del criterio de población aplicable, disponiéndose, que no se denegará el certificado por la saturación de otras áreas de servicio del mismo municipio. Entre los factores que se considerarán está la densidad poblacional del área, la población flotante, si alguna, y las vías de acceso para llegar a la facilidad 
*672
propuesta.

3) No se podrá autorizar el establecimiento de nuevas farmacias en un área hasta tanto las farmacias existentes a una (1) milla a la redonda sobrepasen un promedio de dos mil (2,000) recetas por farmacia por mes, excluyendo las farmacias en instituciones gubernamentales. Se podrá tomar en cuenta el horario de servicios y los planes médicos a que se acogen las farmacias establecidas."

En la situación de autos, el Departamento de Salud concluyó que la propuesta de la peticionaria no cumplía el requisito poblacional establecido por dicho artículo, ya que la población a ser servida por la farmacia era inferior a 9,000 personas. Dicha conclusión etuvo basada en el testimonio del perito de la parte opositora, quien utilizó una metodología distinta a la del perito de la parte peticionaria para determinar la población flotante.
Es norma reiterada del Derecho Administrativo que en las revisiones judiciales las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si las mismas están basadas en evidencia sustancial que obra en el expediente administrativo. 3 L.P.R.A. see. 2175. Asociación de Doctores en Medicina al Cuidado de la Salud Visual v. Colegio de Optómetras de Puerto Rico, _ D.P.R. _ (1993), 93 J.T.S. 12, a la pág. 10,349; P.R.T.C. v. Unión Independiente de Empleados Telefónicos, _ D.P.R. _ (1992), 92 J.T.S. 93, a la pág. 9,710; Henríquez v. Consejo de Educación Superior, 120 D.P.R. 194, 210 (1987).
El art. 11 de la Ley Núm. 2 dispone, sobre este particular, que las determinaciones de hecho del Secretario del Departamento sostenidas por evidencia, "serán concluyentes". 24 L.P.R.A. sec. 334f-7 (Supl. 1996).
Las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto y su revisión judicial se limita a determinar si la agencia actuó arbitraria o ilegalmente o en forma tan irrazonable que su actuación constituyó un abuso de su discreción. Fuertes v. A.R.P.E., _ D.P.R. _ (1993), 93 J.T.S. 108 a la pág. 11,385. Por el contrario, si las interpretaciones de la agencia especializada son razonables y consistentes con el propósito legislativo que inspiran los estatutos directivos, el tribunal debe abstenerse de intervenir con las mismas. Comisionado de Seguros de P.R. v. General Accident Insurance Co., _ D.P.R. _ (1993), 93 J.T.S. 10, a la pág. 10,334; Colón Ventura v. Méndez, _ D.P.R. _ (1992), 92 J.T.S. 51, a la pág. 9,454; Vázquez v. A.R.P.E., _ D.P.R. _ (1991), 91 J.T.S. 53, a la pág. 8,657.
En el caso de autos, entendemos que la decisión de la agencia está sostenida por la evidencia sustancial en el récord ante la agencia. La controversia entre las partes, en este sentido, parece haber girado más bien en torno a la metodología utilizada para la determinación de la población a ser atendida por la farmacia en cuestión, en particular el componente atribuible a la "población flotante", que es uno de los elementos establecidos citado por el Art. VI, inciso 13(2) del Reglamento.
La consideración de la población a ser atendida por una facilidad de salud parece esencial para la recta planificación de los servicios de salud a nivel regional. En otros contextos, el número apropiado de proveedores se deja a las fuerzas del mercado. Si la oferta de servicios excede grandemente la demanda, es anticipable que un número de los proveedores fracasen. Si en algún momento los proveedores resultan ser muy pocos, se elevarán los precios y existirá un incentivo para que aumente la competencia. Dejadas a las fuerzas del mercado, de este modo, las fluctuaciones en la oferta se estabilizan en el largo plazo.
En el campo de la salud, sin embargo, la filosofía adoptada por el Legislador ha sido distinta. La libre competencia entre los proveedores se restringe, para evitar que las fluctuaciones de mercado disminuyan en momento alguno el número de proveedores que resulta indispensable para atender de forma adecuada a la población existente. El perjuicio social que se produce al haber menos servicios de salud que los necesarios, hace aconsejable que se atienda el impacto negativo que el establecimiento de una nueva facilidad de salud puede plantear para otras facilidades existentes. En términos prácticos, uno de los indicadores objetivos más razonables para esta determinación habrá de ser la población.
El concepto de "población flotante" es uno de naturaleza ambigua y problemática. El mismo conlleva, dentro de la realidad geográfica de Puerto Rico, un múltiple conteo de una misma población. Un individuo o familia, *673 por ejemplo, pueden ser considerados para fines del establecimiento de facilidades de salud en su área de residencia, pero también pueden ser contabilizados para fines del establecimiento de facilidades en otros lugares más distantes que pudieran ser visitados periódicamente por ellos, para fines de hacer compras, visitas, trabajo, etc.
No es difícil de apreciar que, debido a la alta densidad poblacional de nuestra jurisdicción, la relativa proximidad de las ciudades y centros comerciales, así como los patrones de consumo de nuestros ciudadanos, grandes sectores de nuestra población se desplazan en todo momento a través de la Isla, principalmente en las zonas costeras de mayor desarrollo urbano. Dentro de este contexto, el énfasis irrestricto en el criterio de "población flotante" puede resultar en la distorsión de cualquier criterio poblacional.
Una comarca de población relativamente exigua, pero situada cerca de una vía principal, puede contar con una "población flotante" suficiente para justificar el establecimiento de facilidades de salud que realmente no pueden ser sostenidas por la población real. Aunque en el caso de los centros comerciales es más plausible suponer que la "población flotante" habrá de incrementar el consumo de los servicios de salud que se ubiquen allí, el empleo extensivo de este concepto suscita numerosas interrogantes, aun en estos casos. Distintos centros comerciales a través de la Isla podrían compartir una misma población flotante, produciéndose un indeseable efecto multiplicador sin que exista una verdadera variación en las necesidades de salud de la Sociedad.
Otros jueces de este Tribunal han señalado las dificultades implícitas en este concepto, así como la ausencia de una reglamentación específica del Departamento de Salud que pudiera producir uniformidad en este tipo de evaluación. Véanse, e.g., Farmacia Fajardo Gardens v. Departamento de Salud, KAC-93-041Z, KAC-93-1075, JAC-94-0105 (sentencia de 23 de enero de 1995) (Juez Rodríguez de Oronoz); Walgreens of San Patricio, Inc. v. K-Mart Corp., KAC-92-1079, KAC-92-971 (sentencia de 25 de febrero de 1994) (Juez Alfonso de Cumpiano). Coincidimos con dichos magistrados en que resulta deseable la adopción de una reglamentación específica para la consideración de este factor. En su ausencia, opinamos que cualquier solicitud de un C.N.C. que pretenda satisfacer los requisitos de población vigentes a base de una "población flotante" debe ser evaluada con cautela.
En la situación de autos, hemos considerado el análisis de la prueba pericial llevado a cabo por el Oficial Examinador. Entendemos que los reparos a la metodología utilizada por el perito de la parte peticionaria son razonables. Correspondía a dicha parte despejar cualquier interrogante y poner a la agencia en condiciones de conceder su solicitud. No estamos en posición de sustituir el juicio del Departamento de Salud de que la peticionaria no consiguió descargar dicho peso. Debe recordarse que al conceder un C.N.C., el Secretario de Salud formula política pública en el área de salud. Ruiz Hernández v. Mahíques, 120 D.P.R. a la pág. 89. Su discreción debe gozar de una amplitud proporcional y recibir la mayor deferencia por parte de los tribunales.
La peticionaria sugiere que el Tribunal de Primera Instancia no podía concluir que la decisión de la agencia estaba apoyada por evidencia sustancial en el récord, sin antes haber expedido el auto y examinado la totalidad del expediente ante la agencia. Opinamos que el Tribunal de Instancia podía (como lo hemos hecho nosotros) formular una apreciación del récord a base de los documentos incluidos con el recurso de revisión, los cuales contenían caracterizaciones de los testimonios recibidos por el Departamento de Salud. La peticionaria no alude a ninguna porción específica de la prueba que hubiese sido citada*incorrectamente por la agencia. Su insatisfacción, de este modo, parece referirse, no al contenido del récord, sino a la apreciación del mismo realizada por el Tribunal. Toda vez que el peso correspondía a la peticionaria para persuadir al Tribunal de la expedición del auto y que la revisión judicial estaba limitada a verificar si las determinaciones de la agencia estaban sostenidas por la evidencia desfilada ante el foro administrativo, y no a una evaluación independiente de la prueba, estimamos que no actuó incorrectamente el Tribunal.
El planteamiento de la peticionaria implicaría que, al cuestionarse las determinaciones de hecho de una agencia, un tribunal siempre vendría obligado a la expedición de un auto de revisión. Tal no ha sido, que conozcamos, la práctica en nuestra jurisdicción en cuanto a autos discrecionales.
El error no se cometió.
*674 y
El tercer señalamiento de error versa sobre la imposición de honorarios de abogado a la peticionaria por parte del Tribunal de Primera Instancia.
El propósito de la imposición de honorarios de abogado es el de sancionar al litigante perdidoso que por su temeridad, obstinación, contumacia e insistencia en una actitud frívola o desprovista de fundamento, obliga a la otra parte a asumir innecesariamente las molestias, gastos, trabajo e inconveniencias de un pleito. Véanse, Fernández v. S.J. Cement, 118 D.P.R. 713, 718 (1987); Soto v. Lugo, 76 D.P.R. 444, 448 (1954). La partida de honorarios de abogado concedida de ordinario no será alterada en apelación a menos que la misma sea excesiva, exigua o constituya un abuso de discreción. Miranda v. E.L.A., _ D.P.R. _ (1994), 94 J.T.S. a la pág. 525; Ramírez v. Club Cala de Palmas, 123 D.P.R. 339, 349-350 (1989).
En el caso de autos, creemos que la peticionaria no actuó con temeridad. Poseía argumentos razonables para solicitar, como en efecto lo ha hecho, la revisión judicial de la decisión administrativa. Se elimina la concesión de honorarios de abogado.
VI
Por los fundamentos antes expresados se expide el auto solicitado y se modifica la sentencia del Tribunal de Primera Instancia a fines de eliminar la imposición de honorarios de abogado. Así modificada, se confirma.
Lo pronunció y manda el Tribunal y lo certifica la señora Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General