*1015 TEXTO COMPLETO DE LA SENTENCIA
El 26 de marzo de 1997, el Tribunal de Primera Instancia emitió determinación mediante la cual ordenó el traslado a este Tribunal del presente caso. Ante nuestra consideración tenemos una solicitud de revisión que la Sociedad Española de Auxilio Mutuo y Beneficencia (Auxilio Mutuo) presentara ante el Tribunal de Primera Instancia, Sala Superior de San Juan. Mediante el mencionado recurso de revisión, el Auxilio Mutuo pretende la revocación de la resolución en reconsideración emitida el 20 de junio de 1995, por el Departamento de Salud, por medio de la cual fue denegado el CNC que había solicitado para el establecimiento de un centro de cimgía cardiovascular dentro de sus facilidades.
El 22 de mayo de 1996, el Tribunal de Primera Instancia emitió Sentencia en la que determinó que existía un conflicto de intereses en la persona de la Secretaria de Salud por lo cual al ésta adjudicar sobre la expedición del CNC no fue protegido el debido proceso de ley en el proceso. Las partes opositoras a la concesión del CNC, Hospital Pavía, Hospital San Pablo y el Centro Cardiovascular de Puerto Rico y el Caribe presentaron sendas mociones de reconsideración. Finalmente, luego de varios trámites procesales, el 26 de septiembre de 1996, el Tribunal de Primera Instancia decide acoger para estudio algunos de los argumentos esbozados en las mociones de reconsideración y solicita la transcripción de los procedimientos administrativos para decidir en los méritos las controversias del caso.
El 18 de febrero de 1997, el Auxilio Mutuo presentó una moción para que el caso fuera referido ante nos.
Luego del estudio y análisis de los documentos que nos han sido sometidos y del derecho aplicable, EXPEDIMOS el auto de Revisión solicitado, REVOCAMOS la Resolución en reconsideración emitida por el Departamento de Salud y ORDENAMOS la expedición del CNC a favor del Auxilio Mutuo.
I
El Hospital Auxilio Mutuo es uno de los hospitales privados más grandes en Puerto Rico. El Auxilio Mutuo cuenta con una unidad de cuidado intensivo médico-quirúrgico, con una unidad de cuidado intensivo coronario y con una unidad de cuidado intermedio coronario. Además, existe una unidad de cuidado intensivo pediátrico y una unidad de cuidado intensivo neonatal. El 21 de septiembre de 1993, el Hospital Auxilio Mutuo presentó ante el Departamento de Salud, una solicitud para la expedición de un Certificado de Necesidad y Conveniencia (CNC), con el propósito de establecer un Centro de Cirugía Cardiovascular y ofrecer dentro de sus facilidades este tipo de cirugía.
A esta solicitud presentaron oposición el Hospital San Pablo, el Hospital Pavía y el Centro Cardiovascular de Puerto Rico y el Caribe, los cuales cuentan con salas de cirugía cardiovascular. La vista administrativa del caso fue celebrada durante los días 16 y 17 de agosto de 1994, el 22 de noviembre de 1994 y el 27 de enero de 1995.
Tanto antes como durante la vista, el Auxilio Mutuo planteó que la Secretaria de Salud, Carmen Feliciano de Melecio, quien tenía la facultad, por disposición legislativa, de otorgar o denegar el CNC, no debía en este caso adjudicar sobre la solicitud presentada, por ser la Presidenta de la Junta de Directores del Centro Cardiovascular de Puerto Rico y el Caribe, una de las partes opositoras a la concesión del CNC. El Auxilio Mutuo sostenía que los roles de adjudicadora y parte opositora que recaían sobre Feliciano, significaban un conflicto de intereses lo cual atentaba contra su derecho a un debido proceso de ley.
El 4 de abril de 1995, el oficial examinador emitió su decisión y recomendó a la Secretaria de Salud que otorgara el CNC solicitado por el Auxilio Mutuo. El oficial examinador estudió la prueba testifical, pericial y estadística sometida por las partes para sostener su decisión. El oficial examinador estableció que de acuerdo al número de pacientes candidatos a una cirugía cardiovascular que recibía el Auxilio Mutuo, al por ciento de prevalencia de las enfermedades coronarias en la Isla, a la proyección de población de edad avanzada en Puerto Rico, la tasa de muertes en Puerto Rico por *1016 enfermedades del corazón y al resultado de ciertos estudios realizados sobre el porciento de cirugías del corazón en los Estados Unidos, el CNC debía ser concedido.
En su decisión el oficial examinador expuso que la prueba sometida por los peritos de los hospitales opositores a la solicitud del CNC no le convenció. El oficial examinador señaló que las proyecciones hechas por estos peritos, en cuanto al crecimiento en el número de cirugías del corazón, eran incongruentes con el ritmo de crecimiento presentado en los últimos años en la Isla y estaban reñidas con el incremento en el número de cirugías realizadas en San Pablo y en el Centro de Cirugía Cardiovascular.
Además de estas consideraciones, el oficial examinador consideró que muchos cirujanos cardiovasculares no intervienen quirúrgicamente a los pacientes si el hospital no cuenta con un personal de diálisis altamente entrenado y que sólo el Auxilio Mutuo contaba con tales facilidades y el personal adiestrado. También fue señalado en la decisión, que el Auxilio Mutuo posee buenos médicos cirujanos y un alto número de técnicos y enfermeras de cirugía. Por último, fue determinado que el proyecto planificado y propuesto por el Auxilio Mutuo era viable económicamente.
El oficial examinador estudió las guías generales establecidas en la ley, [Artículo 3, Ley de Certificados de Necesidad y Conveniencia, 24 L.P.R.A. Sección 334 (b)], para la evaluación de las solicitudes de un CNC. Como parte de su estudio consideró la relación entre el establecimiento del centro de cirugía cardiovascular y el plan de desarrollo de servicios tanto a corto como a largo plazo, la necesidad en la población de los servicios que proveería el centro, otras alternativas a la propuesta y la disponibilidad de recursos humanos y económicos.
La decisión señala que la necesidad del centro de cirugía cardiovascular quedó ampliamente demostrada de acuerdo al crecimiento en demanda experimentado desde sus inicios por las salas de cirugía de los hospitales opositores y la tasa de operaciones de corazón abierto por habitantes registrada en los últimos años en Estados Unidos. También la decisión expresa que según la capacidad en que operan los centros de cirugía en el Hospital San Pablo y el Centro de Cirugía Cardiovascular de Puerto Rico y el Caribe, de no aumentar los centros de cirugía cardiovascular en el país, los pacientes tendrían que optar por viajar a los Estados Unidos para satisfacer sus necesidades.
Además, al analizar las alternativas de tratamiento para los pacientes cardíacos con fallos renales, el oficial examinador concluyó que sólo el Auxilio Mutuo cuenta con el equipo adecuado para atender tales pacientes. El oficial examinador estableció que el Auxilio Mutuo poseía los recursos económicos y humanos para hacer viable el centro propuesto y finalmente expuso que el centro de cirugía cardiovascular solicitado establecería un desarrollo del Hospital Auxilio Mutuo como un hospital supraterciario y de esta-forma sería alcanzado uno de los fines del Plan Estatal de Salud. El 5 de abril de 1995, la Secretaria de Salud, emitió una resolución por medio de la cual adoptó la decisión y las recomendaciones del oficial examinador.
El Centro Cardiovascular de Puerto Rico y el Caribe, el Hospital San Pablo y el Hospital Pavía, presentaron ante el Departamento de Salud mociones de reconsideración a las cuales presentó oposición el Auxilio Mutuo.
El 20 de junio de 1995, la Secretaria de Salud emitió Resolución en Reconsideración y revocó la resolución del 5 de abril de 1995 y, en consecuencia, denegó el CNC solicitado.
Feliciano determinó que la prueba aportada por el Auxilio Mutuo fue insuficiente para demostrar el cumplimiento con los criterios establecidos en el Reglamento Número 56 de 14 de agosto de 1996, del Secretario de Salud. Feliciano expuso que el permitir durante la vista que fuera modificado sustancialmente el contenido de la propuesta (de una sala de cirugía a dos salas) fue un proceso irregular.
Feliciano determinó, además, que en Puerto Rico existen 14 salas autorizadas para cirugías cardiovasculares en cuatro instituciones del país, lo que significa una oferta en exceso de la demanda. Feliciano acogió el testimonio de uno de los peritos que testificó que las facilidades existentes tienen una capacidad excesiva de un 45% sobre la demanda que puede ser anticipada para el año 2000.
*1017 Según la decisión, las estadísticas de la Asociación Americana del Corazón y el aumento en los procedimientos de angioplastías demuestran una tendencia a disminuir o a reducir la incidencia de cirugías cardiovasculares. La Secretaria de Salud expuso que el crear facilidades adicionales para un centro de cirugía cardiovascular resultaría en afectar negativamente la economía, el nivel de utilización de la capacidad de las salas ya existentes y provocaría una competencia por el personal diestro existente. Según la resolución, el Auxilio Mutuo tiene tres hospitales en la región metropolitana donde referir los pacientes.
También Feliciano señaló que el Auxilio Mutuo no aportó prueba que estableciera el costo o inversión de capital real atribuible a la creación de una unidad cardiovascular en sus facilidades hospitalarias. La Secretaria de Salud determinó que el testimonio pericial del doctor Pérez carecía de valor probatorio.
El 24 de julio de 1995, el Auxilio Mutuo compareció y solicitó, ante el Tribunal de Primera Instancia, Sala Superior de San Juan, la revisión judicial de la resolución en reconsideración que emitiera la Secretaria de Salud, el 20 de junio de 1995. Mediante la resolución recurrida, Feliciano denegó la solicitud de CNC, la cual había sido concedida anteriormente, mediante resolución de 5 de abril de 1995.
El Auxilio Mutuo sostiene en su escrito que el estimado que acogió Feliciano en cuanto a la demanda de operaciones cardiovasculares al año 2000 no tiene apoyo en la prueba y es contrario a la misma. Además, el Auxilio Mutuo sostiene que los centros de cirugía existentes han mostrado un patrón de aumento significativo en el número de cirugías, que según los estudios realizados en EEUU veremos un crecimiento en enfermedades del corazón y que las estadísticas de la Asociación Americana del Corazón vislumbran un ascenso en las cirugías, lo que es incongruente con la proyección de demanda considerada.
El Auxilio Mutuo plantea, además, que los centros existentes no crean un exceso de oferta de servicios en el país y que en el expediente administrativo no obra data que apoye tal conclusión. También señala el Auxilio Mutuo que los centros existentes no cuentan con el equipo necesario para atender una emergencia post-operatoria.
Por otra parte, el Auxilio Mutuo expuso que el personal necesario para atender el centro estaría compuesto de los actuales empleados del Auxilio Mutuo los cuales recibirían entrenamiento especial y de no poder ser así, el hospital reclutaría un nuevo personal que no tuviera que ver con los empleados que laboran en el resto de los centros existentes en el país. En la solicitud de revisión el Auxilio Mutuo plantea que el hecho de que durante la vista hayan sido solicitadas dos salas de cirugía, en vez de una, no significa un cambio sustancial al estudio de viabilidad presentado. Esto porque la segunda sala no altera el número de pacientes u operaciones sino que sólo tiene como propósito la conveniencia de los cirujanos y el personal que trabajará en la cirugía. Sobre este punto el Auxilio Mutuo aclaró que los testigos que testificaron sobre las modificaciones estuvieron sujetos a ser contrainterrogados y que la otra parte no cuestionó con respecto a las mencionadas modificaciones.
Por último, el Auxilio mutuo sostiene que presentó un voluminoso estudio sobre el costo del establecimiento del centro.
El 1 de agosto de 1995, el Hospital San Pablo presentó una moción de desestimación la cual acogieron el Hospital Pavía y el Centro Cardiovascular de Puerto Rico y el Caribe. El Auxilio Mutuo presentó oposición a la referida solicitud. El 13 de diciembre de 1995, el Tribunal de Primera Instancia declaró Sin Lugar la moción de desestimación.
El 9 de enero de 1996, el Hospital Pavía presentó oposición a la solicitud de revisión. En esta misma fecha, el Centro Cardiovascular de Puerto Rico y el Caribe también presentó escrito en oposición. El Hospital San Pablo presenta su oposición a la revisión el 23 de enero de 1995. Por su parte, el 22 de febrero de 1996, el Auxilio Mutuo compareció en un escrito de réplica a las oposiciones sometidas a la solicitud de revisión. El 26 de febrero de 1996, el Departamento de Salud compareció ante el Tribunal de Primera Instancia y presentó también un escrito en oposición al recurso de revisión solicitado.
*1018 Luego de ciertos trámites, el 22 de mayo de 1996 el Tribunal de Primera Instancia emitió sentencia. En la sentencia el tribunal a quo señaló dos puntos; primero, que la decisión de la Secretaria de Salud era incompatible y contraria al informe rendido por el oficial examinador y, segundo, que existía una situación clara de conflicto de intereses. El tribunal expuso que era conflictivo el que la Secretaria de Salud, quien tomó la decisión de no expedir el CNC, fuera a su vez la Presidenta de la Junta de Directores del Centro Cardiovascular de Puerto Rico y el Caribe, una de las partes opositoras. El Tribunal de Primera Instancia concluyó que Feliciano debió inhibirse, y que al no haberlo hecho así violentó el debido proceso de ley. El tribunal ordenó al Departamento de Salud expedir el CNC a favor del Auxilio Mutuo.
En junio de 1996, comparecieron el Hospital San Pablo y el Centro Cardiovascular de Puerto Rico y el Caribe y solicitaron la reconsideración de la sentencia. El 24 de junio de 1996, el Tribunal de Primera Instancia emitió una orden en la que dispuso sobre las mociones de reconsideración presentadas por los hospitales. Mediante esta orden el tribunal rechazó los planteamientos expuestos por las partes con respecto a la existencia de un conflicto de intereses. Sin embargo, el tribunal acogió los planteamientos con respecto a que las mociones de reconsideración que habían sido sometidas ante el Departamento de Salud en el momento en que el CNC fue otorgado y las cuales forman parte del expediente, no fueron consideradas al momento del tribunal emitir sentencia sobre el caso. Además, el tribunal decidió considerar el planteamiento sobre la adecuacidad del remedio otorgado por el tribunal y la necesidad de resolver en los méritos las controversias envueltas en el caso. El tribunal ordenó al Auxilio Mutuo a que compareciera y presentara su posición con respecto a las mociones presentadas por San Pablo y el Centro Cardiovascular.
El 25 de junio de 1996, el Auxilio Mutuo presentó un escrito en oposición a las mociones de reconsideración sometidas. El 19 de julio de 1996, el Auxilio Mutuo compareció en cumplimiento de orden y expuso su posición con respecto a los planteamientos acogidos para estudio por el tribunal a quo. El 26 de septiembre de 1996, el Tribunal de Primera Instancia decidió resolver la controversia sobre la concesión del CNC en sus méritos y con este propósito solicitó la transcripción de la prueba presentada ante el foro administrativo.
Mientras estos trámites tenían lugar en el Tribunal de Primera Instancia, el 28 de junio de 1996, Pavía presentó ante el Tribunal de Circuito de Apelaciones un escrito de certiorari. En el escrito señaló que el Tribunal de Primera Instancia erró al ordenar la expedición del CNC y no examinar los méritos de los planteamientos establecidos por Pavía en la moción de reconsideración que sometiera ante el Departamento de Salud, la cual llevó a la Secretaria de Salud a revocar en reconsideración su anterior decisión. El Auxilio Mutuo, como parte recurrida, alegó que la presentación del mencionado recurso era una prematura.
El Tribunal de Circuito de Apelaciones, el 1 de noviembre de 1996, emitió resolución mediante la cual determinó que el recurso presentado era uno prematuro ya que el Tribunal de Primera Instancia tenía bajo su consideración las mociones de reconsideración presentadas por los opositores a la expedición del CNC. Este Tribunal señaló a las partes que una vez el tribunal a quo emitiera sentencia, el foro apelativo estaría a la disposición de las partes afectadas por la decisión.
El 18 de febrero de 1997, el Hospital Auxilio Mutuo presentó "Moción urgente para que se refiera el caso al Tribunal de Circuito de Apelaciones"; alegó que en cumplimiento a lo dispuesto en la Ley de la Judicatura el caso debía ser trasladado al Tribunal de Circuito de Apelaciones. El 26 de marzo de 1997 el Tribunal de Primera Instancia emitió Orden de Traslado del presente caso. Este Tribunal tiene ante su consideración el expediente del caso y las transcripciones de la prueba presentada en el foro administrativo.
n
Conforme nuestro ordenamiento jurídico, la función revisora de los tribunales con respecto a las determinaciones de los organismos administrativos es una de carácter limitado. Las decisiones y criterios considerados por las agencias administrativas merecen deferencia de los tribunales en vista de la vasta experiencia y el conocimiento especializado (expertise) de estos organismos dentro del ámbito de sus particulares encomiendas. La Facultad para las Ciencias Sociales v. C.E.S., 93 J.T.S. 88. De conformidad con esta norma, es reconocida una presunción de legalidad y corrección a favor *1019 de las decisiones administrativas. A.R.P.E. v. Junta de Apelaciones Sobre Construcciones y Lotificaciones, 124 D.P.R. 858 (1989).
La revisión judicial de las determinaciones de las agencias está regida por el principio de "evidencia sustancial". La jurisprudencia ha definido el concepto de "evidencia sustancial" como aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. Hilton v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1953). Como consecuencia de este criterio, los tribunales no deben alterar las determinaciones de los hechos de existir evidencia sustancial en el récord que sostenga dichas determinaciones.
El Tribunal Supremo de Puerto Rico ha indicado, al hablar sobre el rol de los tribunales al revisar decisiones administrativas, que "su grado de especialización justifica que se sostenga en principio sus determinaciones y que éstas no pueden ser variadas, sino cuando exista arbitrariedad, ilegalidad o irrazonabilidad de parte de la agencia o cuando la determinación no se sostenga a la luz de prueba sustancial existente en la totalidad del récord," Misión Industrial v. Junta de Planificación, 97 J.T.S. 33. Por ello, los tribunales deten limitar su intervención a determinar si la agencia obró arbitraria o ilegalmente o en forma tan irrazonable que su actuación constituyó un abuso de discreción. El criterio de los organismos administrativos no debe ser sustituido a menos que infrinja directamente valores constitucionales fundamentales o que la actuación administrativa sea totalmente arbitraria.
Las conclusiones del oficial examinador de la agencia administrativa forman parte del récord del caso por lo que merecen la consideración de los tribunales en el momento de la revisión. El Tribunal Supremo ha expresado que "cuando el informe del oficial examinador que preside la vista es contrario e incompatible con el del organismo administrativo, particularmente en cuestiones que dependen del contacto inmediato con la prueba, nuestra función revisora es susceptible de tomarse más rigurosa," Henríquez v. Consejo Educación Superior, 120 D.P.R. 194 (1987).
Hemos delimitado nuestra consideración sobre el caso según la doctrina establecida. Al examinar el expediente del caso y los trámites habidos en el foro administrativo, encontramos que existe prueba sustancial que sustenta las determinaciones del oficial examinador. La prueba pericial, testifical, junto con las estadísticas y estudios presentados por las partes, certifican la necesidad y conveniencia del establecimiento por el Auxilio Mutuo de un centro para cirugías cardiovasculares, según el criterio de evidencia relevante para que una mente razonable sostenga la decisión.
Luego del estudio y análisis de la totalidad del expediente del caso, encontramos que la prueba presentada en el caso, en conjunto, apoya la decisión y conclusión del oficial examinador y no la decisión emitida en reconsideración por la Secretaria de Salud.
Dado el resultado a que hemos llegado, es innecesario determinar si procedía la descalificación de la Secretaria de Salud ante la alegación de conflicto de intereses.
Por lo tanto, EXPEDIMOS el auto de Revisión solicitado, REVOCAMOS la determinación emitida por el Departamento de Salud y ORDENAMOS la expedición del CNC a favor del Auxilio Mutuo.
Así lo acordó y manda el Tribunal y lo certifica la Señora Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General