ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| JORGE BLASINI CRUZ<br><br>Parte Recurrente<br><br><br>v.<br><br><br>DEPARTAMENTO DE CORRECCIÓN Y REHABILITACIÓN<br><br>Parte Recurrida | KLRA202500238 | *Revisión Judicial,* procedente del Departamento de Corrección y Rehabilitación<br><br>Caso Núm.:<br>Confinado núm.: B7-20623<br><br>Sobre:<br>Escala de Reclasificación |

Panel integrado por su presidente, el Juez Salgado Schwarz, el Juez Monge Gómez, y el Juez Sánchez Báez[1].

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de junio de 2025.

Compareció, por derecho propio, la parte recurrente, Sr. Jorge Blasini Cruz (en adelante, el "Sr. Blasini" o "Recurrente"), quien se encuentra confinado en una institución correccional del País, mediante recurso de revisión judicial presentado el 21 de abril de 2025. Nos solicitó la revocación del Acuerdo del Comité de Clasificación y Tratamiento del Departamento de Corrección y Rehabilitación (en adelante, el "Comité") el 29 de enero de 2025 y notificada al Recurrente el 30 de enero de 2025. Mediante la referida determinación, el Comité reclasificó la custodia del señor Blasini Cruz de mínima a custodia máxima. Dicho dictamen fue objeto de una solicitud de reconsideración que denegada por la agencia el 24 de febrero de 2025.

Por los fundamentos que expondremos a continuación, se *confirma* el dictamen recurrido.

**I.**

Surge del expediente ante nuestra consideración que el 19 de junio de 2000 el señor Blasini Cruz fue sentenciado a noventa y nueve (99) años de prisión, por

---

[1] Mediante la Orden Administrativa Núm. OATA-2025-068, se designó al Hon. Isaías Sánchez Báez en sustitución del Hon. Félix R. Figueroa Cabán, debido al cese de funciones de este último como Juez de Apelaciones.

los delitos de asesinato en primer grado y violaciones a los Artículos 6 y 8 de la entonces vigente Ley Núm. 17 de 19 de enero de 1951, según enmendada, conocida como la "Ley de Armas de Puerto Rico". Para cumplir la sentencia en su totalidad, tiene como fecha tentativa el 25 de septiembre de 2099. Igualmente, podrá ser evaluado por la Junta de Libertad Bajo Palabra a partir del 4 de noviembre de 2028. Durante el transcurso del cumplimiento de su sentencia, el Recurrente ha sido clasificado y reclasificado en custodias de seguridad mediana y máxima, luego de la ocurrencia de eventos que no son pertinentes a la controversia que nos ocupa.

Así las cosas, el 22 de enero de 2024, el Comité emitió una *Resolución* mediante la cual ratificó una reclasificación a custodia mínima que se le efectuó al Sr. Blasini el 29 de enero de 2021. Sin embargo, posteriormente, se le presentó una querella disciplinaria por violaciones a las disposiciones de la Regla 15, Código 108, y la Regla 16, Código 200 del Reglamento Núm. 9221 de 8 de octubre de 2020, conocido como el "Reglamento para Establecer el Procedimiento Disciplinario de la Población Correccional". Como parte de dicho procedimiento interno, el Recurrente resultó incurso en las violaciones anteriormente detalladas. Como resultado de ello, el 27 de enero de 2025, la técnico socio penal a cargo evaluó la custodia del Recurrente y como parte de la misma arrojó un cálculo de trece (13) puntos, equivalentes a custodia máxima. Como consecuencia de esto, el 29 de enero de 2025, el Comité evaluó el caso del señor Blasini y lo reclasificó a custodia máxima mediante un "**Acuerdo del Comité de Clasificación y Tratamiento**" (en adelante, el "Acuerdo"), notificado al Recurrente el 30 de enero de 2025*.*

Inconforme, el señor Blasini presentó una solicitud de reconsideración que fue denegada el 26 de febrero de 2025 y notificada a éste el 20 de marzo de 2025. Aun insatisfecho, el Recurrente presentó el recurso de revisión judicial que nos ocupa, mediante el cual le imputó al Departamento de Corrección y Rehabilitación (en adelante, "DCR") la comisión de los siguientes errores:

> **ERRÓ LA AGENCIA AL CONSERVAR EL CAMBIO DE CUSTODIA A UNO DE MÁXIMA, SOLAMENTE POR LA PUNTUACIÓN ARROJADA SIN CONSIDERAR LOS DATOS SOBRE LOS AJUSTES Y PROGRESO DEL SR. BLASINI, AL MENOS DESDE CINCO AÑOS ATRÁS O DESDE SU INGRESO;**

**O LOS CUATRO AÑOS QUE LLEVABA ININTERRUMPIDO EN CUSTODIA MÍNIMA.**

**ERRÓ LA AGENCIA AL INTERPRETAR QUE UNA ACCIÓN DISCIPLINARIA SE REFIERE A LOS CÓDIGOS APARENTE Y ALEGADAMENTE VIOLADOS; UN HECHO CONSTITUYE UNA ACCIÓN, LA QUERELLA DISCIPLINARIA COMO MOTIVO DEL COMITÉ A SUBIR LA CUSTODIA DEL SR. BLASINI SOLO TIENE UN NÚMERO #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 DE QUERELLA, NO DOS. LAS VIOLACIONES A LOS CÓDIGOS SON LA CONDUCTA REFLEJADA EN EL APARENTE VIOLACIÓN DEL HECHO IMPUTADO EN TODO CASO; LA DOCTRINA DEL CONCURSO SERÍA APLICABLE CUANDO ES UN HECHO, AÚN ASÍ LE SUMARON EN EL RENGLÓN 4, COMO SI FUESE DOS QUERELLAS DISCIPLINARIAS, SUMANDO 4 PUNTOS.**

**ERRÓ LA AGENCIA AL NO CONSIDERAR EXPLICAR LA ABREVIACIÓN DE N/A, QUE PUSO AL LADO DEL INC. E. DEBIÓ HABER EXPLICADO Y LOS CRITERIOS A USARSE PARA NO APLICAR EL SUBINC. E. 3 CUANDO LA CONDUCTA DEL SR. BLASINI CRUZ HA SIDO UNA EXCELENTE, INCURRIENDO POR PRIMERA VEZ EN 21 AÑOS ENCONTRADO INCURSO EN UNA QUERELLA AMD. SIN AÚN HABER SIDO FINAL EN LA AGENCIA CUAND EL C.C.T. DECIDE SUBIR SU CUSTODIA. DICHA QUERELLA SIN DETERMINACIÓN FINAL EN LA JURISDICCIÓN PRIMARIA FUE EL DÍA 3 DE ABRIL. HOY SE ENCUENTRA EN REVISIÓN ADM PANEL III DE JUECES.**

**ERRÓ LA AGENCIA AL NO TENER REQUISITOS CLAROS Y OBJETIVOS EN QUE DE, CÓMO, CUÁNDO Y QUIÉNES DEBEN O PUEDEN APLICAR EL INC. E, Y CUÁNDO Y CÓMO EXPLICAR PORQUE NO O SI ES MERITORIO CONSIDERAR ESE INC. E, EL CUAL NO TUVIERON NI TOMARON EN CUENTA LOS LOGROS Y LOS AÑOS DE AJUSTES Y PROGRESO EN DOS DÉCADAS Y 1/3 DE BUENA CONDUCTA EXCELENTE REFLEJADA POR EL SR. BLASINI, CONFORME A SU VIDA INSTITUCIONAL Y PLANES INSTITUCIONALES ANTERIORES.**

El 16 de junio de 2025, el DCR presentó un "**Escrito en Cumplimiento de Resolución y Solicitud de Desestimación**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II.

### A.

Es norma reiterada en nuestro ordenamiento jurídico que los tribunales apelativos están llamados a abstenerse de intervenir en las decisiones administrativas, ya que éstas poseen una presunción de legalidad y corrección. ECP Incorporated v. OCS, 205 DPR 268, 281 (2020); Torres Rivera v. Policía de PR, 196 DPR 606, 626 (2016). Cónsono con ello, se ha resuelto que las decisiones de las agencias administrativas gozan de la mayor deferencia por los tribunales. Oficina de Ética Gubernamental v. Martínez Giraud, 210 DPR 79, 88-89 (2022).

Ello debido a que dichos entes gubernamentales son los que poseen el conocimiento especializado y experiencia en los asuntos que les son encomendados. Buxó Santiago v. ELA, 215 DPR ___ (2024); 2024 TSPR 130; Super Asphalt v. AFI, 206 DPR 803, 819 (2021). En los casos de revisión judicial, "[e]l criterio a aplicarse no es si la decisión administrativa es la más razonable o la mejor al arbitrio del foro judicial; es, repetimos, si la determinación administrativa, en interpretación de los reglamentos y las leyes que le incumbe implementar, es una razonable". Rivera Concepción v. A.R.Pe, 152 DPR 116, 124 (2000).

Sin embargo, recientemente, nuestro Tribunal Supremo adoptó la determinación del Tribunal Supremo de los Estados Unidos en el caso de Loper Bright Enterprises v. Raimondo, 603 US 369 (2024). En específico, dictaminó que la interpretación de las leyes es una tarea que le corresponde a los tribunales y dispuso que éstos, en el ejercicio de su función revisora, deberán actuar con el rigor que prescribe la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico y no ser guiados por una deferencia automática. Vázquez v. Consejo de Titulares, 2025 TSPR 56, 215 DPR ___.

La Sección 4.5 de la LPAU, dispone que "[l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo". 3 LPRA sec. 9675. Así pues, la intervención judicial en estos casos ha de centrarse en tres aspectos principales: (1) si el remedio concedido fue apropiado; (2) si las determinaciones de hechos están razonablemente sostenidas por la prueba y (3) si las conclusiones de derecho del organismo administrativo son correctas. P.R.T.C. Co. v. J. Reg. Tel. de P.R., 151 DPR 269, 281 (2000). Podemos decir que la deferencia reconocida a la decisión de una agencia administrativa cede en las siguientes circunstancias: cuando no está basada en evidencia sustancial, cuando el organismo administrativo ha errado en la aplicación de la ley y cuando ha mediado una actuación irrazonable o ilegal. T-JAC, Inc. v. Caguas Centrum Limited, 148 DPR 70, 80 (1999).

Las determinaciones de hechos de los organismos y agencias administrativas tienen a su favor una presunción de regularidad y corrección. Henríquez v. Consejo Educación Superior, 120 DPR 194, 210 (1987). De manera

que los tribunales apelativos no intervienen con las determinaciones de hechos formuladas por una agencia administrativa si éstas están sostenidas por evidencia sustancial que surja del expediente administrativo. Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 DPR 70, 75 (2000).

Según lo ha definido el Tribunal Supremo en diversas ocasiones, evidencia sustancial es "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". Hilton Hotels v. Junta Salario Mínimo, 74 DPR 670, 687 (1953). Por ello, quien impugne las determinaciones de hechos de una agencia administrativa tiene el deber de presentar ante el foro judicial la evidencia necesaria que permita, como cuestión de derecho, descartar la presunción de corrección de la determinación administrativa. El peso de la prueba descansa entonces sobre la parte que impugna la determinación administrativa. Com. Vec. Pro-Mej., Inc. v. J.P., 147 DPR 750, 761 (1999). Además, debe demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración. Rebollo v. Yiyi Motors, 161 DPR 69, 76-77 (2002).

Las conclusiones de derecho, tal y como surge de la Sección 4.5 de la LPAU, supra, pueden ser revisadas en todos sus aspectos. 3 LPRA sec. 9675. Sin embargo, esto no significa que, al ejercer su función revisora, podamos descartar liberalmente las conclusiones e interpretaciones de la agencia, sustituyendo el criterio de ésta por el propio. "Al evaluar los casos es necesario distinguir entre cuestiones de interpretación estatutaria, en la que los tribunales son especialistas, y cuestiones propias para la discreción o pericia administrativa". Adorno Quiles v. Hernández, 126 DPR 191, 195 (1990).

El foro judicial podrá sustituir el criterio del organismo administrativo por el propio únicamente en aquellas ocasiones que no encuentre una base racional que fundamente la actuación administrativa. No obstante, es axioma judicial que, ante la prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y, por tanto, está facultado para apreciar la prueba

apoyándose en su propio criterio. Dye-Tex de P.R., Inc. v. Royal Ins. Co., 150 DPR 658, 662 (2000).

Sin embargo, la deferencia judicial en la revisión de determinaciones administrativas no conlleva la renuncia de este Tribunal a su función revisora. Simplemente, define el carácter limitado de la función revisora a casos apropiados. La deferencia reconocida no equivale a la dimisión de la función revisora de este foro apelativo intermedio en instancias adecuadas y meritorias, como resulta ser cuando la agencia ha errado en la aplicación de la ley. Reyes Salcedo v. Policía de P.R., 143 DPR 85, 94 (1987).

**B.**

El Artículo VI, Sección 19 de nuestra Carta Magna establece la política púbica del Estado de "reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social". Art. VI, Sec. 19, Const. PR, LPRA, Tomo 1. De conformidad con dicho axioma constitucional, el Artículo 2 del Plan de Reorganización Núm. 2 de 21 de noviembre de 2011, según enmendado, conocido como el "Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011" (en adelante, el "Plan de Reorganización"), dispone que:

> La política pública del Gobierno de Puerto Rico a través de la creación de un sistema integrado de seguridad y administración correccional donde las funciones y deberes se armonicen en un proceso facilitador a la imposición de penas y medidas de seguridad, así como a la custodia de ciudadanos que han sido encontrados incursos en la comisión de un delito o falta y que establezcan procesos de rehabilitación moral y social del miembro de la población correccional o transgresor, a fin de fomentar su reincorporación a la sociedad. 3 LPRA Ap. XVIII, Art. 2.

A tenor con las disposiciones del Artículo 7, inciso (aa), del Plan de Reorganización, el DCR tendrá la facultad para:

> [A]doptar, establecer, desarrollar, enmendar, derogar e implementar reglas, reglamentos, órdenes, manuales, normas y procedimientos para el funcionamiento efectivo del Departamento y de los organismos bajo su jurisdicción, a los fines de regir la seguridad, la disciplina interna y la conducta de funcionarios, empleados y de la clientela, así como los programas y servicios. 3 LPRA Ap. XVIII, Art. 7 (aa).

De conformidad con las facultades anteriormente detalladas, el DCR aprobó el Reglamento Núm. 9151 de 22 de enero de 2020, conocido como el

"Manual para la Clasificación de los Confinados" (en adelante, el "Manual"). Este Manual se aprobó con el propósito de establecer un sistema organizado para ingresar, procesar y asignar a los confinados a instituciones y programas de adultos del DCR. Parte II (Propósito), Reglamento Núm. 9151 de 22 de enero de 2020, *supra*, pág. 2. Establece, además, que "[l]a clasificación adecuada de los confinados contribuirá favorablemente a la planificación, tanto a corto como a largo plazo, proveyendo la información necesaria para lograr eficacia en la administración, investigación y preparación de presupuestos". Íd.

El Manual determina que "la clasificación de los confinados consiste en la separación sistémica y evolutiva de estos subgrupos, en virtud de las necesidades de cada individuo, y las exigencias y necesidades de la sociedad, desde la fecha de ingreso del confinado hasta la fecha de su excarcelación". Parte I (Introducción), Reglamento Núm. 9151 de 22 de enero de 2020, *supra* pág. 1. Asimismo, añade que "[a]demás de satisfacer las necesidades del confinado, el proceso de clasificación coordina la custodia física de los confinados en los programas y recursos disponibles dentro del Sistema Correccional". Íd.

Así pues, el sistema correccional ubica a cada confinado en el programa y nivel de custodia menos restrictivo posible para el que éstos cualifiquen. Íd. El Tribunal Supremo de Puerto Rico ha puntualizado que la determinación administrativa relacionada con el nivel de custodia asignado a un confinado requiere que se realice un balance de intereses adecuado. Cruz v. Administración, 164 DPR 341, 352 (2005). Ese proceso requiere sopesar el interés público de lograr la rehabilitación del confinado con el interés de mantener la seguridad institucional y general del resto de la población penal. Íd. De igual manera, dicho ejercicio requiere que se examine el beneficio del confinado de permanecer en un determinado nivel de custodia. Íd. Para estos propósitos, se deben considerar varios factores subjetivos y objetivos al momento de determinar la procedencia de un cambio de custodia, para lo cual se requiere la pericia del DCR. Íd.

El Manual establece cuatro (4) niveles de custodia: (1) máxima; (2) mediana; (3) mínima; y (4) mínima/comunidad. Sección 1, Reglamento Núm. 9151 de 22 de enero de 2020, *supra*, págs. 8-10. Igualmente, define el concepto "reclasificación" como la "[r]evisión periódica de los confinados en lo que respecta

a su progreso como parte del Plan Institucional, así como también a su nivel de custodia". Íd., pág. 12. En lo pertinente al recurso que nos ocupa, la Sección 7 del Manual regula el proceso de reclasificación de custodia. El mismo tiene como propósito establecer el proceso que se debe llevar a cabo para la revisión del nivel de custodia en el que está ubicado cada confinado y poder estar en posición de determinar cuán apropiada es la asignación de custodia actual. Íd., pág. 48. Este cuerpo reglamentario destaca la importancia de que aquellos confinados que cumplan sentencias prolongadas tengan la oportunidad de reducir sus niveles de custodia, a través del cumplimiento de los requisitos de la institución correccional en la que se encuentren recluidos. Íd. No obstante, aclara que "[l]a reevaluación de custodia no necesariamente tiene como resultado un cambio en la clasificación de custodia o la vivienda asignada", sino que "[s]u función primordial es verificar la adaptación del confinado y prestarle atención a cualquier situación que pueda surgir". Íd.

Por su parte, el inciso C del acápite III de la referida Sección, enumera una serie de datos básicos relacionados con la clasificación que el técnico de servicios sociopenal debe tomar en consideración en los procedimientos de reclasificación. En lo aquí pertinente, se deberán evaluar delitos actuales, sentencias actuales, el historial delictivo, fecha de excarcelación prevista, récord de conducta disciplinaria y el récord de participación en programas. Íd., págs. 51-52.

El procedimiento de reclasificación de custodia se lleva a cabo mediante una "**Escala de Reclasificación de Custodia (Casos Sentenciados)**" (en adelante, la "Escala"). En esencia, se trata de un documento que se utiliza para actualizar y revisar la evaluación de custodia del confinado. Íd. El documento se divide en ocho (8) renglones. Cada renglón tiene una escala numérica en la que se le asigna una puntuación al confinado evaluado. La puntuación de cada renglón depende, a su vez, de diversos factores tales como: (1) la gravedad de los cargos o condenas actuales; (2) historial de delitos graves previos; (3) historial o tentativas de fuga; (4) números de acciones disciplinarias; (5) acciones disciplinarias previas serias; (6) sentencias anteriores por delitos graves como

adulto en los últimos cinco (5) años; (7) participación en programas y tratamiento; y (8) la edad actual del confinado.[2]

En lo que respecta al renglón o inciso cuatro (4) de la Escala relativa a la cantidad de acciones disciplinarias, se acumula una puntuación de cero (0) puntos cuando el confinado no ha tenido acciones disciplinarias; una puntuación de dos (2) cuando ha tenido una acción disciplinaria; un cálculo de cuatro (4) puntos cuando ha tenido dos acciones disciplinarias; y una calificación de seis (6) puntos cuando ha tenido tres o más acciones disciplinarias.[3] Esta puntuación se adjudica tomando en cuenta la última clasificación. Es decir, se le asignará al confinado la puntación que corresponda considerando si, desde la última evaluación, ha sido objeto de acciones disciplinarias o no.[4]

Una vez se le asigna al confinado una puntuación en cada renglón, se suman todas las puntuaciones. El resultado total de la suma determinará el nivel de custodia de este último, el cual está basado igualmente en una escala numérica. La referida escala está estructurada de la siguiente manera:

> Cinco (5) puntos o menos en los renglones uno (1) al ocho (8), custodia mínima.
>
> Cinco (5) puntos o menos en renglones uno (1) al ocho (8) con órdenes de arresto o detención u orden de detención por violar la libertad bajo palabra o probatoria, custodia mediana.
>
> Seis (6) a diez (10) puntos en renglones uno (1) al ocho (8), custodia mediana.
>
> Siete (7) puntos o más en renglones uno (1) al tres (3), custodia máxima.
>
> Once (11) puntos o más en renglones uno (1) al ocho (8), custodia máxima.[5]

La segunda hoja del formulario consiste en un resumen de la escala y recomendaciones por parte del técnico de servicios sociopenal. En lo pertinente, contiene la escala antes descrita en su inciso (A) y, entre otros, un inciso (E) que establece las "Modificaciones Discrecionales para un Nivel de Custodia más Bajo.[6] En ese sentido, el técnico de servicios sociopenal puede tomar en cuenta como atenuantes al nivel de custodia, y de forma discrecional, la gravedad del

---

[2] *Véase*, Apéndice K, Reglamento Núm. 9151 de 22 de enero de 2020, *supra*.
[3] Íd.
[4] Apéndice K, Sección II (4), Reglamento Núm. 9151 de 22 de enero de 2020, *supra*.
[5] Íd., Sección III (A).
[6] *Véase*, Apéndice K, Reglamento Núm. 9151 de 22 de enero de 2020, *supra*.

delito, la conducta anterior excelente, la conducta excelente y la estabilidad emocional del confinado. Cuando el técnico de servicios sociopenal completa el formulario objeto de esta discusión, procede que las recomendaciones hechas por éste sean revisadas. Así, el acápite IV de la Sección 7 del Manual dispone la manera en que se revisarán las recomendaciones de reclasificación. Con respecto a los confinados sentenciados indica que:

> La recomendación del Técnico de Servicios Sociopenales será enviada al Comité de Clasificación y Tratamiento para su revisión y determinación.
>
> Las determinaciones del Comité de Clasificación y Tratamiento deberán estar basadas en el análisis de la totalidad de los expedientes del confinado desde su ingreso hasta el momento de su evaluación conforme a la Reglamentación aplicable. Íd., pág. 53.

Por otro lado, es norma consabida que el DCR merece particular deferencia en lo relacionado al proceso de clasificación de confinados. Lebrón Laureano v. Depto. Corrección, 209 DPR 489, 503 (2022). Ello está atado a la experiencia y pericia de la cual está investida dicha agencia para llevar a cabo este tipo de evaluación. Íd. A tono con ello, se ha resuelto que una decisión de custodia deberá ser sostenida por los tribunales en un proceso de revisión judicial, siempre que la misma no sea irrazonable y caprichosa. Esa razonabilidad está atada a que la determinación administrativa del DCR cumpla con los procedimientos de las "reglas y manuales in alterar *los términos de la sentencia impuesta*". Íd., pág. 504 (énfasis en el original).

**III.**

En el presente caso, el Recurrente nos solicitó la revocación del "**Acuerdo del Comité de Clasificación y Tratamiento**", mediante el cual reclasificó al señor Blasini de custodia mínima a custodia máxima.

Atenderemos de manera conjunta el primer, tercer y cuarto señalamiento de error por entender que están relacionados entre sí. El Recurrente señaló en primer lugar, que el DCR erró al mantener el cambio de custodia de mínima a máxima, solamente por la puntuación arrojada en la "**Escala de Reclasificación de Custodia (Casos Sentenciados)**", sin haber tomado en consideración los ajustes y el progreso de éste, al menos por los últimos cinco (5) años. Asimismo, señaló que erró la agencia al no explicar por qué no tomó en consideración el

inciso (E) de la Escala para establecer un nivel de custodia más bajo. También planteó que la Recurrida erró al no tener requisitos claros y objetivos relacionados a la consideración y aplicación del inciso (E) del documento objeto de esta discusión. No nos convence su postura. Veamos.

Conforme hemos discutido anteriormente, el propósito de la reclasificación es identificar cuáles son los procesos para la revisión del nivel de custodia vigente de cada confinado y así determinar cuán apropiada es la custodia actual. Aunque el cuerpo reglamentario discutido con anterioridad establece que una reevaluación de custodia no necesariamente tiene como resultado un cambio en el nivel de custodia, la finalidad de este procedimiento es determinar si el nivel de custodia actual es el adecuado. El nivel matemático de la "**Escala de Reclasificación de Custodia (Casos Sentenciados)**" es utilizado por el técnico de servicios sociopenal como una guía. Mediante ella, y de acuerdo con la puntuación total arrojada, determina el nivel de custodia al que debe estar sujeto el confinado. Además, queda a la discreción de éste tomar en consideración los ajustes y progresos a los que hace referencia el inciso (E). Es decir, queda a discreción del técnico que evalúa el caso tomar en consideración, entre otros, la conducta anterior del Recurrente para reducir el nivel de custodia. Nótese, pues, que el propio documento dispone que dichos factores son discrecionales en el proceso de evaluación de la custodia de un confinado.[7]

Igualmente, se desprende del propio formulario que las conclusiones del técnico de servicios sociopenal son **recomendaciones**.[8] Cuando somete las mismas al Comité de Clasificación y Tratamiento, le corresponde a este último emitir la determinación final sobre la reclasificación del nivel de custodia. Además, como indicáramos anteriormente, las determinaciones que haga el Comité al momento de evaluar las recomendaciones del técnico de servicios sociopenal, deberán estar basadas en el análisis de la totalidad de los expedientes del confinado desde su ingreso hasta el momento de su evaluación.

Al examinar detenidamente el legajo apelativo ante nuestra consideración, notamos que el Comité basó su determinación en un análisis de la totalidad de las

---

[7] *Véase*, Apéndice K del Manual para la Clasificación de los Confinados.
[8] Íd.

circunstancias que se evidenciaban del expediente administrativo del Recurrente ante el DCR, en lo que respecta con su nivel de custodia. A esos efectos, es de particular importancia pormenorizar las razones que condujeron al DCR para reclasificar el nivel de custodia del señor Blasini, veamos:

1- No ha cumplido con su plan institucional correctamente al salir incurso en una querella disciplinaria por violación a los Códigos 108 Posesión, distribución, uso, venta o introducción de teléfonos celulares o equipo de telecomunicaciones. Código 200 Contrabando. Se le administró la Escala de Reclasificación de Custodia para casos sentenciados para una **puntuación de 13**[,] equivalente a una custodia Máxima. Demostrando con sus acciones que no hay un verdadero compromiso con su rehabilitación y no cumple en seguir las reglas institucionales. De un total de 99 años de sentencia por los delitos de Asesinato en Primer Grado, Posesión y uso de Armas Cargadas y Portación de Arma sin licencia, lo cual comprueba la carencia de control ante sus acciones y la necesidad de programas de tratamiento. Ha cumplido en prisión 21 años, 2 meses y 20 días. La JLBP asume jurisdicción del caso desde el 4 de noviembre de 2028 y su fecha prevista de excarcelación está pautada para el 10 de junio de 2099. No tiene casos pendientes. Consta de antecedentes penales. Requiere continuar cumpliendo sentencia en niveles de máxima seguridad y evaluar los ajustes en este nivel.

2- Según su nivel de custodia y seguridad requerida.

3- Por no surgir evidencia de labores ni estudios durante periodo evaluado.[9]

Contrario a lo argumentado por el señor Blasini en su recurso, el DCR sí tomó en consideración los factores de progreso y ajustes presentados por éste. De hecho, expuso que el Recurrente no presentó modificación alguna en su conducta que justificara su permanencia en custodia mínima. Según pudimos observar, la agencia recurrida concluyó que el señor Blasini no demostró un verdadero compromiso con su rehabilitación y tampoco seguía las reglas de conducta que regían en su institución carcelaria.

De otra parte, la falta de explicación por parte de la técnico sociopenal para no tomar en consideración los factores detallados en el inciso E de la Escala tampoco pueden ser una razón en derecho para acoger su postura en cuanto a la revocación de la determinación recurrida. Nótese que dichos elementos decisorios en cuanto a la recomendación que se le efectúa al Comité de Clasificación y

---

[9] *Véase*, Apéndice del recurso de *revisión judicial*, pág. 6 (énfasis suplido).

Tratamiento son meramente factores discrecionales que se le reconocen al técnico sociopenal que evalúa el caso. Además, la inclusión de los mismos debe estar basada en evidencia que demuestre ajustes adecuados del confinado y cómo éste se ha beneficiado de los programas de tratamiento requeridos. El Recurrente falló en proveer la evidencia documental sustancial que nos mueva a modificar la determinación a la que arribó el Comité de Clasificación y Tratamiento a la hora de acoger la recomendación efectuada por la técnico sociopenal. Por tanto, concluimos que no se cometieron los errores alegados.

Como segundo señalamiento de error, el señor Blasini plantea que incidió la Recurrida al haberle asignado una puntuación de cuatro (4) puntos en el renglón cuatro (4) correspondiente al número de acciones disciplinarias de la Escala. Alega que el DCR asignó esta puntuación equivalente a dos (2) acciones disciplinarias anteriores, en lugar de una (1). Veamos.

Precedentemente, examinamos las puntuaciones asignadas al renglón cuatro (4) de la mencionada Escala. Indicamos que se le asigna al confinado una puntuación de cero (0) puntos cuando este no ha tenido acciones disciplinarias; una puntuación de dos (2) puntos cuando ha tenido una acción disciplinaria; una puntuación de cuatro (4) puntos cuando ha tenido dos acciones disciplinarias; y una puntuación de seis (6) puntos cuando ha tenido tres o más acciones disciplinarias. Así, se le asignará al confinado la puntación que corresponda considerando si, desde la última clasificación, ha sido objeto de acciones disciplinarias o no.

Luego de la última evaluación que se le efectuó al señor Blasini, el 24 de octubre de 2024 se radicó contra éste una querella disciplinaria por violaciones a las disposiciones de la Regla 15, Código 108, y la Regla 16, Código 200 del Reglamento para Establecer el Procedimiento Disciplinario de la Población Correccional, *supra*. Por lo tanto, aún si acogiéramos la postura del Recurrente en cuanto a su reclasificación se refiere, notamos que él había sido objeto de una (1) acción disciplinaria y no dos (2). Por consiguiente, le correspondería una puntuación de dos (2) puntos en el renglón cuatro (4) equivalente a una (1) acción disciplinaria, en lugar de cuatro (4) puntos, cuya puntuación corresponde a dos (2) acciones disciplinarias, desde la última clasificación. En este caso, si se realiza el

cambio de cuatro (4) puntos a dos (2) puntos en el referido renglón, la suma total de la "**Escala de Reclasificación de Custodia (Casos Sentenciados)**" se reduce de trece (13) puntos a once (11) puntos. Sin embargo, aun cuando se realiza el ajuste correcto de la puntuación, conforme plantea el Recurrente, el total que arroja la suma de todos los renglones corresponde a un nivel de custodia máxima. En otras palabras, aun reconociendo que el DCR cometió un error en la sumatoria de los valores correspondientes a cada renglón bajo evaluación, lo cierto es que indistintamente el resultado de la sumatoria reflejaba un total representativo de custodia máxima.

Así pues, luego de un análisis detenido del caso de epígrafe, concluimos expresamente que el Recurrente no aportó evidencia suficiente para derrotar la presunción de corrección de la cual están investidas las decisiones del foro administrativo. En el ejercicio de nuestra función revisora, venimos compelidos a darle deferencia a la especialización, experiencia y las cuestiones propias de la discreción o pericia de las agencias administrativas. Tal y como hemos adelantado, somos de la opinión de que la agencia recurrida no actuó de manera arbitraria, ilegal, irrazonable o fuera del marco de los poderes que se le delegaron.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte del presente dictamen, se *confirma* la determinación recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones
